RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0267p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

RONALD PHILLIPS; RAYMOND TIBBETTS; ROBERT J.
VAN HOOK,

                *Plaintiffs-Appellants*,

    *v.*

MIKE DEWINE, Attorney General of the State of
Ohio; JOHN R. KASICH, Governor of the State of
Ohio; DONALD MORGAN, Warden of the Southern
Ohio Correctional Facility; GARY C. MOHR,
Director of the Ohio Department of Rehabilitation
and Corrections,

                *Defendants-Appellees*.

No. 15-3238

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:14-cv-02730—Gregory L. Frost, District Judge.

Argued: April 19, 2016

Decided and Filed: November 2, 2016

Before: NORRIS, SILER, and STRANCH, Circuit Judges.

———————————

#### COUNSEL

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellants. Tiffany L. Carwile, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, David C. Stebbins, Allen L. Bohnert, Sharon Hicks, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, Lisa M. Lagos, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellants. Tiffany L. Carwile, Bridget E. Coontz, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

    SILER, J., delivered the opinion of the court in which NORRIS, J., joined. STRANCH, J. (pp 17–35), delivered a separate dissenting opinion.

1

---

**OPINION**

---

SILER, Circuit Judge.   In this appeal, a group of inmates sentenced to death in Ohio challenge the constitutionality of the State's newly enacted statutory scheme concerning the confidentiality of information related to lethal injection. The district court dismissed some of their claims for a lack of standing and the remainder for failure to state a claim. For the reasons stated below, we **AFFIRM**.

I.

In December 2014, the Ohio General Assembly passed Substitute House Bill No. 663 ("HB 663") to address the confidentiality of information related to lethal injection in Ohio. HB 663 contains four provisions relevant to this appeal.   First, under HB 663, the identity of individuals and entities that participate in the lethal injection process is treated as confidential and privileged under law; cannot be disclosed as a public record; and is not subject to disclosure during judicial proceedings, except in limited circumstances (the "Confidentiality Provision"). Ohio Rev. Code §§ 149.43(A)(1)(cc), 2949.221(B)–(C).[1]   Second, HB 663 directs courts to seal

---

[1]Section 149.43 specifically provides:

(A) As used in this section:

> (1) "Public record" means records kept by any public office, including, but not limited to, state, county, city, village, township, and school district units, and records pertaining to the delivery of educational services by an alternative school in this state kept by the nonprofit or for-profit entity operating the alternative school pursuant to section 3313.533 of the Revised Code. "Public record" does not mean any of the following:

. . . .

>> (cc) Information and records that are made confidential, privileged, and not subject to disclosure under divisions (B) and (C) of section 2949.221 of the Revised Code.

In relevant part, § 2949.221 provides:

(B) If, at any time prior to the day that is twenty-four months after the effective date of this section, a person manufactures, compounds, imports, transports, distributes, supplies, prescribes, prepares, administers, uses, or tests any of the compounding equipment or components, the active pharmaceutical ingredients, the drugs or combination of drugs, the medical supplies, or the medical equipment used in the application of a lethal injection of a drug or combination of drugs in the administration of a death sentence by lethal injection as provided for in division (A) of section 2949.22 of the Revised Code, notwithstanding any provision of law to the contrary, all of

records that contain information related to the identity of an individual or entity that participates in the lethal injection process unless "the court determines that the record is necessary for just adjudication" (the "Record-Sealing Provision"). *Id.* § 2949.222. If the court makes such a determination, it must hold a private hearing to review the record, and the record is subject to

---

the following apply regarding any information or record in the possession of any public office that identifies or reasonably leads to the identification of the person and the person's participation in any activity described in this division:

(1) The information or record shall be classified as confidential, is privileged under law, and is not subject to disclosure by any person, state agency, governmental entity, board, or commission or any political subdivision as a public record under section 149.43 of the Revised Code or otherwise.

(2) The information or record shall not be subject to disclosure by or during any judicial proceeding, inquiry, or process, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.

(3) The information or record shall not be subject to discovery, subpoena, or any other means of legal compulsion for disclosure to any person or entity, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.

(4)(a) If the information or record pertains to the manufacture, compounding, importing, transportation, distribution, or supplying of any of the items or materials described in division (B) of this section, the person or entity that maintains the information or record shall disclose the information or record to the Ohio ethics commission and the commission may use the information or record, subject to division (B)(1) of this section, only to confirm the following:

(i) That the relationship between the person and the department of rehabilitation and correction is consistent with and complies with the ethics laws of this state;

(ii) That at the time of the specified conduct, the person has all licenses required under the laws of this state to engage in that conduct and the licenses are valid.

(b) If the Ohio ethics commission receives any information or record pursuant to division (B)(4)(a) of this section, the commission shall complete its use of the information or record for the purposes described in that division within fourteen days of its receipt and shall promptly report its findings to the director of rehabilitation and correction.

(C)(1) If, at any time prior to the day that is twenty-four months after the effective date of this section, an employee or former employee of the department of rehabilitation and correction or any other individual selected or designated by the director of the department participates or participated in the administration of a sentence of death by lethal injection, as provided for in division (A) of section 2949.22 of the Revised Code, subject to division (C)(2) of this section and notwithstanding any other provision of law to the contrary, the protections and limitations specified in divisions (B)(1), (2), and (3) of this section shall apply regarding any information or record in the possession of any public office that identifies or reasonably leads to the identification of the employee, former employee, or other individual and the employee's, former employee's, or individual's participation in the administration of the sentence of death by lethal injection described in this division.

(2) Division (C)(1) of this section does not apply with respect to information or a record that identifies or reasonably leads to the identification of the director of rehabilitation and correction or the warden of the state correctional institution in which the administration of the sentence of death takes place.

further disclosure only if, "through clear and convincing evidence presented in the private hearing, [the court] finds that the person whose identity is protected appears to have acted unlawfully with respect to the person's involvement in the administration of a lethal injection." *Id.* § 2949.222(C).[2]  Third, HB 663 prevents licensing authorities from taking disciplinary action against an individual or entity based on participation in the lethal injection process (the "Licensure-Immunity Provision").  *Id.* § 2949.221(E).[3]  And fourth, HB 663 permits an individual or entity who has participated in the lethal injection process to bring "a civil cause of

---

[2]Section 2949.222 provides in full:

(A) As used in this section, "seal a record" means to remove a record from the main file of similar records and to secure it in a separate file that contains only sealed records accessible only to the court.

(B) The court promptly shall order the immediate sealing of records containing information described in division (B) or (C) of section 2949.221 of the Revised Code and the person's participation in any activity described in the particular division, whenever the records come into the court's possession.

(C) If a record containing information described in division (B) or (C) of section 2949.221 of the Revised Code and the person's participation in any activity described in the particular division, is subpoenaed or requested by a court order, the director of rehabilitation and correction shall provide the record. If the court determines that the record is necessary for just adjudication, the court shall order the director to appear at a private hearing with a copy of the record and any other relevant evidence. The information is not otherwise subject to disclosure unless the court, through clear and convincing evidence presented in the private hearing, finds that the person whose identity is protected appears to have acted unlawfully with respect to the person's involvement in the administration of a lethal injection as contemplated by the first paragraph of division (B) and by division (C)(1) of section 2949.221 of the Revised Code.

[3]Section 2949.221(E) provides:

If a person or entity that, at any time prior to the day that is twenty-four months after the effective date of this section, participates in, consults regarding, performs any function with respect to, including any activity described in division (B) of this section, or provides any expert opinion testimony regarding an execution by lethal injection conducted in accordance with division (A) of section 2949.22 of the Revised Code is licensed by a licensing authority, notwithstanding any provision of law to the contrary, the licensing authority shall not do any of the following as a result of that participation, consultation, performance, activity, or testimony by the person or entity:

      (1)  Challenge, reprimand, suspend, or revoke the person's or entity's license;

      (2)  Take any disciplinary action against the person or entity or the person's or entity's licensure.

action against any person who discloses the identity and participation in the activity in violation of this division" (the "Civil-Action Provision"). *Id.* § 2949.221(F).[4]

Shortly after HB 663 was passed, Ronald Phillips, Raymond Tibbetts, and Robert Van Hook, prisoners sentenced to death in Ohio (the "Plaintiffs"), filed an action in federal court against Ohio Governor John Kasich, Ohio Attorney General Mike DeWine, Director of the Ohio Department of Rehabilitation and Correction Gary Mohr, and Warden of the Southern Ohio Correctional Facility Donald Morgan (the "Defendants"), challenging HB 663's constitutionality.[5]   The Plaintiffs brought several claims:   (1) a claim that HB 663 unconstitutionally burdens speech (the "Free-Speech Claim"); (2) a claim that HB 663 creates a regime of unconstitutional prior restraint (the "Prior-Restraint Claim"); (3) claims that HB 663 violates the Plaintiffs' equal-protection and due-process rights, as well as their right of access to the courts (the "Equal-Protection, Due-Process, and Right-of-Court-Access Claims"); and (4) a claim that HB 663 denies the Plaintiffs constitutionally protected access to government proceedings (the "Right-of-Access-to-Government-Proceedings Claim").

Mohr and Morgan moved to dismiss the claims against them for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6).  They argued that the Plaintiffs lacked standing to challenge the Licensure-Immunity Provision and the Civil-Action Provision.  In addition, Mohr and Morgan asserted that HB 663's provisions do not suppress the Plaintiffs' speech

---

[4]Section 2949.221(F) provides in full:

A person may not, without the approval of the director of rehabilitation and correction, knowingly disclose the identity and participation in an activity described in the particular division of any person to whom division (B) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division or of an employee, former employee, or other individual to whom division (C)(1) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division. Any person, employee, former employee, or individual whose identity and participation in a specified activity is disclosed in violation of this division has a civil cause of action against any person who discloses the identity and participation in the activity in violation of this division. In a civil action brought under this division, the plaintiff is entitled to recover from the defendant actual damages, punitive or exemplary damages upon a showing of a willful violation of this division, and reasonable attorney's fees and court costs.

[5]This action was initially joined by a fourth inmate, Grady Brinkley, but he did not participate in this appeal.

because they only "limit the information that the State will provide to the public," and that HB 663 is not an unconstitutional prior restraint because it simply "mak[es] information confidential" and "does nothing to restrain the exercise of a First Amendment right." Mohr and Morgan also claimed that the Plaintiffs failed to state an equal-protection, due-process, access-to-the-courts, or access-to-government-proceedings claim. Governor Kasich and DeWine moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, claiming that the Eleventh Amendment barred the Plaintiffs' claims against them. They also joined in the arguments raised in Mohr's and Morgan's motion to dismiss.

The district court granted the Defendants' motions to dismiss. *Phillips v. DeWine*, 92 F. Supp. 3d 702, 705, 718 (S.D. Ohio 2015). After assuming for the sake of argument that the Eleventh Amendment did not bar the claims against Governor Kasich and DeWine, the court found that the Plaintiffs lacked standing to challenge the Licensure-Immunity Provision and the Civil-Action Provision. *Id.* at 709–12. It reasoned that the Plaintiffs suffered only "conjectural or hypothetical injuries" rather than the "requisite distinct and palpable injury" required under Article III. *Id.* at 711.

In addition, the district court found that the Plaintiffs' remaining claims were not plausible. The court read HB 663 as "simply cut[ting] off the [Ohio] government as the source of . . . information" regarding Ohio's execution procedures and "plac[ing] a government worker on the hook for acting as a source." *Id.* at 713. Accordingly, the court found, the statute did not create an unconstitutional prior restraint. *Id.* at 713–14. The court also concluded that the Plaintiffs had no constitutional right to the information they claimed they were being deprived of and that their First, Fifth, and Fourteenth Amendments claims failed because they were premised on such a right. *Id.* at 714–16. Therefore, the district court dismissed the case. *Id.* at 718.[6] It also denied the Plaintiffs' pending motions for a preliminary injunction and for expedited discovery as moot.

---

[6]The court also addressed claims that the Plaintiffs made under the Ohio Constitution and found that they lacked merit. *Phillips*, 92 F. Supp. 3d at 717–18. On appeal, the Plaintiffs do not appear to challenge this determination, and, in any event, they have not raised arguments particular to the Ohio Constitution.

II.

We review dismissals for lack of subject-matter jurisdiction, including those for lack of standing, de novo. *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 709 (6th Cir. 2015) (citing *Miller v. Cincinnati*, 622 F.3d 524, 531 (6th Cir. 2010)).  To the extent we must reach a disputed issue of fact that the district court resolved, however, we review for clear error.  *See Askins v. Ohio Dep't of Agric.*, 809 F.3d 868, 872 (6th Cir. 2016).  Otherwise, we construe the complaint in the light most favorable to the Plaintiffs and accept all well-pleaded factual allegations as true. *Barber v. Miller*, 809 F.3d 840, 843 (6th Cir. 2015) (citing *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014)).

Likewise, we review de novo a grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 785 (6th Cir. 2016) (citing *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)).  Again, we construe the complaint in the light most favorable to the Plaintiffs and accept all well-pleaded factual allegations as true.  *Id.* (citing *Laborers' Local 265 Pension Fund v. iShares Tr.*, 769 F.3d 399, 403 (6th Cir. 2014)).  To withstand a 12(b)(6) motion, "the complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'"  *Long v. Insight Commc'ns of Cent. Ohio, LLC*, 804 F.3d 791, 794 (6th Cir. 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Notwithstanding the district court's reasoning, we may affirm its dismissal of the case "on any ground supported by the record." *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 423 (6th Cir. 2016) (quoting *Bangura v. Hansen*, 434 F.3d 487, 498 n.3 (6th Cir. 2006)).

III.

A.

At the outset, we must determine whether the Plaintiffs have standing, and, if so, for which of their claims.  *See Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012). Article III, Section 2 of the Constitution provides that federal courts may hear and resolve only "Cases" and "Controversies."  As a result, "a plaintiff must demonstrate standing for each claim

he seeks to press." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)). To have standing, a plaintiff must establish (1) an "injury in fact," meaning "an invasion of a legally protected interest [that] is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical"'"; (2) "a causal connection between the injury and the conduct complained of," i.e., the injury complained of must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court"; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alterations in original) (citations omitted). These elements are commonly referred to as the "injury-in-fact," "causation," and "redressability" requirements. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Under this standard, the Plaintiffs lack standing to bring their Free-Speech and Prior-Restraint Claims.

The Plaintiffs attempt to show that they—as death row inmates—are the "object" of HB 663 and that they therefore have standing to challenge the statute. In *Lujan*, the Supreme Court indicated that when "the plaintiff is himself an object of the [government] action . . . at issue . . . , there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." 504 U.S. at 561–62. But the Court distinguished scenarios where a plaintiff is the "object" of a government action from cases in which "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*." *Id.* at 562. In these instances, "much more is needed" and standing "is ordinarily substantially more difficult to establish." *Id.*

In support of their argument, the Plaintiffs claim that the "principal object" of HB 663 is "[t]he facilitation of the[ir] death[s]." HB 663 may have been enacted with this broad purpose in mind, but that is insufficient to make the Plaintiffs the "object" of the statute within the meaning of *Lujan*. Instead, the relevant question is whether the Plaintiffs are within the group of individuals whose conduct the statute regulates. *See Lujan*, 504 U.S. at 562; *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015). Upon examination, HB 663 plainly regulates third parties rather than the Plaintiffs. As discussed above, the Licensure-Immunity

Provision prohibits licensing authorities from taking disciplinary action against an individual based on his or her participation in the lethal injection process. Ohio Rev. Code § 2949.221(E). Because the Plaintiffs lack the capacity to censure, delicense, or otherwise discipline anyone involved in the lethal-injection process, they are not the objects of this provision.[7]   Likewise, the Record-Sealing Provision directs *courts*—not the Plaintiffs—to seal certain information. *Id.* § 2949.222. As for the Confidentiality Provision and the Civil-Action Provision, they prohibit or penalize the disclosure of the identity of participants in the execution process. *See id.* §§ 149.43(A)(1)(cc), 2949.221(B)–(C), (F). But the Plaintiffs have not argued that they have information they are prevented from disclosing, and they have indicated that it is "unlikely" that they will obtain such identifying information. Thus, they are not part of the group whose conduct the provisions govern. As a result, the Plaintiffs cannot claim standing as the "objects" of HB 663 under *Lujan*.

But this is not the end of the matter, because a plaintiff may have standing even if he is not the object of the relevant statute, though it will be more difficult to show. *See Lujan*, 504 U.S. at 561–62. Nonetheless, the Plaintiffs' remaining arguments fail to establish standing for their Free-Speech and Prior-Restraint Claims.

To establish standing for a free-speech claim, the Plaintiffs generally must show that "the rule, policy or law in question has explicitly prohibited or proscribed conduct on the[ir] part." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 711 (6th Cir. 2015) (citing *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1153 (2013); *Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684 (8th Cir. 2003)). In the typical case, a statute must be enforced against the plaintiff before he may challenge its constitutionality, but pre-enforcement is available in some contexts if "threatened enforcement [is] sufficiently imminent"—that is, there is "a credible threat" that the provision will be enforced against the plaintiff. *Susan B. Anthony List v. Driehaus*, 134 S. Ct.

---

[7]The Plaintiffs claim that the Licensure-Immunity Provision prevents "any efforts to persuade licensing authorities to take disciplinary action against those participants who are licensed professionals for ethical violations or other reasons." This is simply not the case. The provision does not prevent individuals from engaging in speech to licensing authorities; rather, licensing authorities cannot take disciplinary action regardless of these overtures. *See* Ohio Rev. Code § 2949.221(E).

2334, 2342 (2014).[8]  Though they aver that HB 663 negatively impacts their right to free speech, the Plaintiffs have not claimed that they hold any information that the statute prevents them from disclosing, and they have averred that it is "unlikely" that they will obtain such information. Moreover, they have not claimed that anyone has threated action against them under the statute. The district court concluded that the Plaintiffs could not have the Civil-Action Provision enforced against them because it created potential liability only for an individual who disclosed "information obtained in an official capacity." *Phillips*, 92 F. Supp. 3d at 712.  But we need not decide whether this is the correct reading of HB 663.  Regardless of whether the statute could conceivably apply to the Plaintiffs, they have not shown a credible threat that any of its provisions could be enforced to prevent the Plaintiffs from engaging in protected speech. Therefore, any claimed injury is conjectural and hypothetical and will not satisfy the injury-in-fact requirement.  *See Clapper*, 133 S. Ct. at 1147 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (quoting *Lujan*, 504 U.S. at 565 n.2)).[9]

As for the Prior-Restraint Claim, we have held that "the prospect of prior restraint and resulting self-censorship can itself constitute the required actual injury" under Article III.  *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007).  Nonetheless, "the requirement of an actual injury is not obviated by . . . [a] prior restraint claim."  *Id.*   The

---

[8]Because the Civil-Action Provision appears to grant a private right of action to death-penalty participants whose identity is disclosed, *see* Ohio Rev. Code § 2949.221(F), it is debatable whether the Plaintiffs could avail themselves of *Susan B. Anthony List*'s standard in seeking pre-enforcement review, *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced.").  But because the Plaintiffs cannot establish standing even under this more favorable standard, we need not resolve the question.

[9]The Plaintiffs also argue that they have suffered injury because they, or others acting on their behalf, cannot attempt to persuade drug manufacturers to cease participation in Ohio's lethal injection process without access to the information HB 663 prevents from being disclosed.  As discussed above, this injury is not the result of a "rule, policy[,] or law" that "has explicitly prohibited or proscribed conduct on the part of the [P]laintiff[s]" and therefore does not provide standing for the Plaintiffs' Free-Speech Claim.  *See Parsons*, 801 F.3d at 711. Nonetheless, this injury does provide standing for their Access-to-Government-Proceedings Claim.  The Plaintiffs essentially argue that they are entitled to know the identity of the drug manufacturers, that HB 663 prevents them from obtaining this information, and that access to the manufacturers' identity would remedy their injury.  This is sufficient to meet all three standing prongs for this claim.  *See Fisher v. King*, 232 F.3d 391, 396 n.5 (4th Cir. 2000).

Plaintiffs must, therefore, show that they are in fact "subject to a prior restraint on protected expression" to establish a sufficient injury. *Van Wagner Boston, LLC v. Davey*, 770 F.3d 33, 38 (1st Cir. 2014); *see also Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1183–84 (10th Cir. 2010) ("[W]e conclude Plaintiffs do not have standing as to this alleged prior restraint. Plaintiffs have cited to nothing in the record indicating their speech or association was altered or deterred in any way by the code, nor have we found any such evidence in our *de novo* review of the record." (footnote omitted)). The Plaintiffs allege that the Record-Sealing Provision is an unconstitutional prior restraint because it mandates the sealing of documents during litigation and that the Civil-Action Provision is also a prior restraint because it grants the Director of the Ohio Department of Rehabilitation and Correction "unfettered discretion" to permit the disclosure of the identities of lethal-injection participants. But, as discussed above, the Plaintiffs have not claimed that there is any speech they are likely to engage in that would require prior approval or otherwise be impeded under these provisions. Thus, they have failed to establish that they are subject to any prior restraint that HB 663 conceivably imposes, and they have failed to show an injury-in-fact to support this claim. *See Van Wagner Boston*, 770 F.3d at 38.

In their complaint, the Plaintiffs claim that "seriously botched lethal[-]injection executions" have occurred in Ohio, that they have "imminent execution dates," and that they have challenged Ohio's execution practices and protocols in the past. They aver that, as a result of HB 663, it is "more likely" that their executions will not meet legal standards. But it is not enough that the Plaintiffs' executions be imminent, because a validly imposed death sentence that is properly carried out is not "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 560; *see also Gregg v. Georgia*, 428 U.S. 153, 169 (1976). While a deficient execution is a very serious matter, the existence of deficiencies in this case is only conjectural or hypothetical and is therefore not imminent for Article III purposes. *See Lujan*, 504 U.S. at 564 n.2.

In addition, the Plaintiffs maintain that they have standing to challenge HB 663 as overbroad or facially invalid "even if [they] have not themselves suffered or been threatened with actual injury." This argument simply lacks merit. Bringing an overbreadth claim does not give the Plaintiffs' carte blanche to maintain a suit in federal court. When considering these

claims, courts indeed relax certain standing doctrines because of the potential for an unconstitutionally overbroad law to "chill" protected speech—that is, the "judicial prediction or assumption that the statute's very existence may cause others before the court to refrain from constitutionally protected speech or expression." *Prime Media*, 485 F.3d at 349 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988)); *see also Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012). But this exception applies only to the prudential standing doctrines, such as the prohibition on third-party standing, and not to those mandated by Article III itself, such as the injury-in-fact requirement. *Prime Media*, 485 F.3d at 350; *see also Lujan*, 504 U.S. at 560 (noting that injury in fact, causation, and redressability form "the irreducible constitutional minimum of standing"). Therefore, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Parsons*, 801 F.3d at 711 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). As discussed above, the Plaintiffs have not satisfied the injury-in-fact requirement. In their complaint, they claim that HB 663 "chills the speech of those participants or former participants in Ohio lethal injection executions" who might have come to disapprove of the death penalty. Whether or not this is the case, it constitutes only an allegation of a subjective chill, which is insufficient to satisfy Article III. *See id.*

Therefore, the Plaintiffs lack standing to bring their Free-Speech and Prior-Restraint Claims.

B.

The Plaintiffs also argue that the district court erred in dismissing their Right-of-Access-to-Government-Proceedings Claim. As a general matter, they claim that the First Amendment prevents state actors from removing from the public domain information that "pertains to a government proceeding historically open to the public and for which public access plays a significant positive role in the functioning of that process." According to the Plaintiffs, an execution is such a proceeding. Nonetheless, the Plaintiffs have failed to state a valid claim.

The Supreme Court's decision in *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), sets the baseline principle for First Amendment claims seeking access to information held by the

government.  *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 559 (6th Cir. 2007); *see also United States v. Miami Univ.*, 294 F.3d 797, 820 (6th Cir. 2002).  *Houchins* recognized that "[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act," and "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." 438 U.S. at 14–15 (plurality opinion).

An exception to *Houchins*'s general rule exists.  In a line of cases beginning with *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980), the Supreme Court has recognized a right of access to certain criminal proceedings and the documents filed in those proceedings. This court has extended this right of access to civil trials, *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178 (6th Cir. 1983), and plea agreements, *United States v. DeJournett*, 817 F.3d 479, 484–85 (6th Cir. 2016).  And it has used the *Richmond Newspapers* framework to analyze whether a right of access exists for university disciplinary proceedings, *United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002), documents related to the issuance and execution of a search warrant, *In re Search of Fair Fin.*, 692 F.3d 424 (6th Cir. 2012), and deportation proceedings, *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002).

To be sure, this court has stated that the *Richmond Newspapers* standard could be used "to determine whether a First Amendment right of access exists in a wide variety of other contexts," *Fair Fin.*, 692 F.3d at 429, but this pronouncement was dicta.  And, while *Detroit Free Press* "question[ed] the vitality of the standard articulated in *Houchins*," it only did so "with respect to cases such as the one presently before [the court]"—a request for public access to deportation proceedings.  303 F.3d at 694–95.  The opinion then hedged on *Houchins*, finding that it may still be good law but that it did not apply to "quasi-judicial government administrative proceeding[s]." *Id.* at 696.  Since *Detroit Free Press*, this court has treated *Houchins* as good law, *see S.H.A.R.K.*, 499 F.3d at 559—which, of course, it is, having never been overruled by the Supreme Court, *see Agostini v. Felton*, 521 U.S. 203, 237 (1997).

In cases similar to the one at bar, other circuits have engaged in a *Richmond Newspapers* analysis, but none of these decisions provides particularly strong support for doing so here.  In *Zink v. Lombardi*, the Eighth Circuit applied the "experience and logic" test, but it did so only

"for the sake of analysis." 783 F.3d 1089, 1112 (8th Cir.) (per curiam), *cert. denied*, 135 S. Ct. 2941 (2015). It did not decide whether the standard applied to the claims at issue. Similarly, in *Wellons v. Commissioner, Georgia Department of Corrections*, the Eleventh Circuit nominally applied the "experience and logic" test, but it did so only to address the question as framed by the plaintiffs in that case. 754 F.3d 1260, 1266 (11th Cir.) (per curiam), *cert. denied sub nom. Wellons v. Owens*, 134 S. Ct. 2838 (2014). The only decision to clearly find that the *Richmond Newspapers* framework applied under similar circumstances was summarily vacated by a unanimous Supreme Court. *See Wood v. Ryan*, 759 F.3d 1076, 1081 (9th Cir.), *vacated*, 135 S. Ct. 21 (2014). Our decision is not strictly controlled by this summary decision, as the Supreme Court found only that the district court did not abuse its discretion in denying a motion for a preliminary injunction and did not decide whether the plaintiff failed to state a claim for access to government records. *Ryan v. Wood*, 135 S. Ct. 21, 21 (2014) (mem.).[10] Nonetheless, a unanimous Supreme Court saw fit to summarily vacate—without briefing or argument—the Ninth Circuit's determination that a death-row inmate seeking state-held information related to the method of his execution "raised serious questions" as to whether he would prevail on a First Amendment claim. *Wood*, 759 F.3d at 1086. This ruling raises grave doubts as to whether such a claim is legally cognizable in the first place.

Therefore, we, like the Eighth Circuit, find the dissent in *Wood* to be persuasive. *See Zink*, 783 F.3d at 1113. The dissent found that the plaintiffs "d[id] not actually assert a right of access to a governmental proceeding" as recognized by *Richmond Newspapers* and its progeny. *Wood*, 759 F.3d at 1092 (Bybee, J., dissenting). It recognized that this right includes a related right to access documents "filed" in those proceedings, but also noted that "[the] right does not extend to every piece of information that conceivably relates to a governmental proceeding, even if the governmental proceeding is itself open to the public." *Id.* Ultimately, Judge Bybee reasoned that this latter category of information is precisely what the plaintiffs sought and identified *Houchins* as supplying the proper rule of decision. *Id.* at 1093.

---

[10]Specifically, the Court reversed the Ninth Circuit's finding that the plaintiff "raised serious questions as to whether a First Amendment right, in the context of a public execution[], attaches to the specific information he request[ed]." *Wood*, 759 F.3d at 1086.

It is worth noting that we have neither adopted nor rejected the Ninth Circuit's position in *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 877 (9th Cir. 2002), that the public has a right of access to executions under *Richmond Newspapers*. We need not resolve that question today. The Plaintiffs do not seek public access to Ohio executions. Rather, their Right-of-Access-to-Government-Proceedings Claim is premised on an assertion of a First Amendment right to "government information" that "pertains to a government proceeding." Neither this court nor the Supreme Court has ever recognized a right so broad. While the public's right of access under the First Amendment covers certain records filed in and transcripts of a qualifying government proceeding, *see DeJournett*, 817 F.3d at 484, it does not follow that this right covers *all* information related to the proceeding. The right of access to government proceedings "is not a tool for judges to pry open the doors of state and federal agencies because they believe that public access to this type of information would be a good idea. It is a qualified right to certain 'proceedings and documents filed therein' and nothing more." *Wood*, 759 F.3d at 1092–93 (Bybee, J., dissenting). The information HB 663 prevents from disclosure is neither information of the type filed in a government proceeding nor its functional equivalent; the Plaintiffs simply seek information related to Ohio executions. Under these circumstances, *Houchins*'s general rule applies. *See id.* at 1093–94.

Finding that the Plaintiffs have stated a valid claim under *Richmond Newspapers* would, of necessity, disregard the general applicability of *Houchins* and represent a significant—and unwarranted—expansion of the right of access under the First Amendment as developed by the Supreme Court and our prior decisions. Therefore, we conclude that the Plaintiffs have failed to state a claim for a violation of their right of access to government proceedings.

C.

On appeal, the Plaintiffs contend that the district court erred in dismissing their Equal-Protection, Due-Process, and Right-of-Court-Access Claims. As the basis for these claims, the Plaintiffs argue that HB 663 prevents them from bringing an effective challenge to Ohio's execution procedures. Specifically, they maintain that HB 663 "denies [them] an opportunity to discover and litigate non-frivolous claims." But no constitutional right exists to discover grievances or to litigate effectively once in court. *Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Hill*

*v. Dailey*, 557 F.3d 437, 439 (6th Cir. 2009). The Plaintiffs have not pointed to any decision recognizing claims similar to the ones they propose. In fact, federal courts have repeatedly rejected such theories. *See Zink*, 783 F.3d at 1108–09; *Wellons*, 754 F.3d at 1267; *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013); *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011); *Giarratano v. Johnson*, 521 F.3d 298, 306 (4th Cir. 2008); *see also Jones v. Comm'r, Georgia Dep't of Corr.*, 812 F.3d 923 (11th Cir. 2016) (Marcus, J., concurring in the denial of rehearing en banc) (rejecting an "abstract and inchoate due process right to discover the identity of the source of the drugs and the name of the executioner so that [an inmate] may challenge [a state's] execution protocol"). Therefore, the district court did not err in dismissing these claims.[11]

D.

The Plaintiffs also maintain that, "[b]ecause the district court erred in dismissing the [c]omplaint, it also erred in denying as moot the motions for preliminary injunction and expedited discovery." As discussed above, however, the case was properly dismissed. When ruling on a matter disposes of an action in its entirety, a district court is generally correct in denying all other pending motions as moot. *See, e.g.*, *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 616 (6th Cir. 2002). Therefore, remand is not necessary to address the now-moot matters.

**AFFIRMED**.

---

[11]In their reply brief, the Plaintiffs also argue that they have stated a plausible Equal-Protection claim because HB 663 "discriminates based on the exercise of a fundamental right," namely "[p]rotected speech by lethal injection opponents." As discussed above, the Plaintiffs have not alleged that they themselves have been or will likely be prevented from engaging in protected speech by HB 663. Therefore, it is doubtful that they have standing to pursue such a claim. Nonetheless, we need not resolve this issue because the Plaintiffs have waived their argument by failing to raise it in the opening brief. *United States v. Hendrickson*, 822 F.3d 812, 830 (6th Cir. 2016).

———————

**DISSENT**

———————

JANE B. STRANCH, Circuit Judge, dissenting.  In January 2014, Ohio executed Dennis McGuire with a lethal injection of midazolam and hydromorphone.  At the time, no state had ever attempted an execution with this combination of drugs.  McGuire's lawyers tried to stay the execution, arguing—unsuccessfully—that the untested method presented a substantial risk of causing McGuire severe pain, and thus violated the Eighth Amendment.  The State of Ohio promised a painless execution, pointing to the testimony of an anesthesiologist who, in the months after the execution, would decide to terminate his contract with the state.  It took 25 minutes for McGuire to die, and witnesses reported that "[t]he process . . . was accompanied by movement and gasping, snorting and choking sounds."  Erica Goode, *After a Prolonged Execution in Ohio, Questions Over 'Cruel and Unusual'*, N.Y. Times, January 17, 2014, at A12.  The priest who accompanied McGuire would later write, "I came out of that room feeling that I had witnessed something ghastly."

This horrifying tale of an execution gone wrong underscores what is at stake in this litigation.  Ohio has not carried out an execution since it botched McGuire's, in part because it has been unable to obtain the drugs needed for lethal injection.  Plaintiffs, inmates under death sentence, attribute this to successful public advocacy:  "Speech opposed to lethal injection as a means of capital punishment has persuaded various actors essential to that process to cease their participation . . . ."  HB 663 is the Ohio legislature's answer to this problem.  Plaintiffs allege that HB 663 silences their side of the public debate by assuring that the identities of all participants in an execution, particularly the drug manufacturers, will be strictly confidential— anonymity enforced through punitive civil sanctions against anyone who discloses their identities.  Plaintiffs challenge the constitutionality of HB 663.

There can be no doubt:  HB 663 will obstruct scrutiny of Ohio's execution protocol. I find this deeply troubling.  We must not forget that, just four years ago, based on Ohio's "persistent failure or refusal . . . to follow its own written execution protocol," we found it necessary "to monitor every execution on an ad hoc basis" because Ohio could not be "trusted to

fulfill its otherwise lawful duty . . . ." *In re Ohio Execution Protocol Litig.*, 671 F.3d 601, 602 (6th Cir. 2012).  HB 663 will impede both discovery and monitoring of the violations that we condemned.

The lead opinion affirms dismissal of plaintiffs' various claims based on standing or failure to state a claim.  So we do not reach the constitutionality of HB 663 today, though I admit great misgivings about this law.  Instead, we address a more limited question:  Did the district court commit error by foreclosing this constitutional inquiry before it was underway?

Yes, in three respects.  First, the district court wrongly concluded that plaintiffs lacked standing to challenge the civil action provision.  Specifically, plaintiffs have standing to raise their First Amendment right to receive information under *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).  Second, in evaluating plaintiffs' First Amendment right of access to execution proceedings and documents, the district court failed to apply the Supreme Court's "experience and logic" test.  *See In re Search of Fair Fin.*, 692 F.3d 424, 429–30 (6th Cir. 2012); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695 (6th Cir. 2002).  Applying the proper test, plaintiffs' allegations are more than sufficient to state a claim.  Lastly, the district court dismissed plaintiffs' due process claim prematurely.  While plaintiffs may not state a due process claim under an access-to-courts theory, they can do so under a procedural due process theory.  I therefore respectfully dissent.

**A. Standing**

The lead opinion concludes that plaintiffs do not have standing to challenge HB 663's civil action provision.  This provision allows any person or entity who has participated in an Ohio execution—including private persons who manufactured, compounded, imported, transported, distributed, supplied, prescribed, prepared, administered, used, or tested lethal-injection drugs, equipment, or other related medical supplies—to bring "a civil cause of action against any person who discloses [their] identity and participation in the activity."  Ohio Rev. Code § 2949.221(F).  The majority observes that "[p]laintiffs have not argued that they have information they are prevented from disclosing"—that is, they have not alleged that the civil-action provision deters them from speaking.  (Maj.Op. at 9.)  Thus, the majority concludes,

plaintiffs "are not part of the group whose conduct the provision[] govern[s]" and "cannot claim standing as the 'objects' of HB 663 . . . ." (*Id.*)

I disagree. It is true that plaintiffs have not alleged that the civil action provision deters them from disclosing information. But the Supreme Court has long recognized that, in addition to the right to speak, the First Amendment demands a corollary right to *receive* information and ideas. *See Va. State Bd. of Pharmacy*, 425 U.S. at 756–57 (citing "numerous" Supreme Court decisions acknowledging the right to receive information and ideas); *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 386–87 (1998) (Rehnquist, J., concurring) ("Our decisions have concluded that First Amendment protection extends equally to the right to receive information . . . ."). The right to receive information "follows ineluctably" from the speaker's right to communicate information and, "[m]ore importantly, . . . is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982). It is derived, in other words, from the First Amendment's role "not only . . . in fostering individual self-expression but also . . . in affording the public access to discussion, debate, and the dissemination of information and ideas." *Id.* at 866.

To have standing to raise a right to receive information claim, a plaintiff must allege that, but for the challenged restriction, a person would be willing to speak. A willing speaker engenders protection beyond his own voice. "Freedom of speech presupposes a willing speaker. But where a speaker exists, . . . the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy*, 425 U.S. at 756; *see also Am. Civil Liberties Union v. Holder*, 673 F.3d 245, 255 (4th Cir. 2011) (observing that the First Amendment "provides standing to persons who are 'willing listeners' to a willing speaker who, but for the restriction, would convey information"); *United States v. Wecht*, 484 F.3d 194, 203 (3d Cir. 2007) (concluding that a third party has standing to raise a right to receive information claim "as long as the third party can demonstrate that an individual subject to the [challenged restriction] would speak more freely if the [restriction] is lifted or modified"); *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 856 F.2d 1563, 1566 (D.C. Cir. 1988) ("It is well established that petitioners, as listeners, can suffer injury from government regulations that prevent speakers

from saying what the listeners wish to hear."); *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 606–08 (2d Cir. 1988) (same).  "The purpose of the 'willing speaker' requirement . . . is . . . to ensure that there is an injury in fact that would be redressed by a favorable decision." *Wecht*, 484 F.3d at 203.

In the present case, plaintiffs allege that "[i]t sometimes happens that persons who have participated in lethal injection executions will, upon ceasing their participation for whatever reason, come to believe from the perspective of their first-hand experience in the process that the death penalty is flawed and should no longer be used." (R. 1, PageID 41, ¶ 106(g).)  Plaintiffs put flesh on that claim by identifying "two former recent directors" of the Ohio Department of Rehabilitation and Corrections and "a recent former Ohio Attorney General" as persons who "have experienced such a conversion." (*Id.*)  By imposing "severe financial penalties," plaintiffs allege, HB 663 "chills the speech of those participants or former participants in Ohio lethal injection executions who experience such a conversion, with the effect being that such persons who would otherwise be willing to speak publicly about their experiences will not be willing to do so . . . ." (*Id.*)  Plaintiffs have alleged the existence of willing speakers who, but for the civil penalty provision, "would speak more freely."  *Wecht*, 484 F.3d at 203; *see also FOCUS v. Allegheny Cty. Court of Common Pleas*, 75 F.3d 834, 839 (3d Cir. 1996) (concluding that it is "reasonable to infer" from allegations that litigants "were willing to talk at some point prior to the entry of the gag orders" that they "are willing but restrained speakers"); *In re Dow Jones & Co.*, 842 F.2d at 607 (concluding that "[i]t is hard . . . to imagine that there are no willing speakers" because "[w]ithout them there would be no need for a restraining order").  At this stage of the litigation, that is sufficient to establish plaintiffs' standing to raise a right to receive information claim.

Once standing is established, plaintiffs allege a viable claim that the civil action provision is an unconstitutional content-based speech restriction.[1]  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or

---

[1]Plaintiffs have also alleged that "in its practical operation" the civil penalty provision "goes even beyond mere content discrimination, to actual viewpoint discrimination." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011).  Even if HB 663 were not content based on its face, these allegations would be sufficient to survive a motion to dismiss. (*See* R. 1, PageID 3, 30, 39–40, 49–50, ¶¶ 3, 93, 106(d)–(e), 136.)

message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). A court should "consider whether a regulation of speech 'on its face' draws distinction based on the message a speaker conveys." *Id.* Facially content-based laws are subject to strict scrutiny. *Id.* This is because "[l]imiting speech based on its 'topic' or 'subject' favors those who do not want to disturb the status quo," and thus poses "the same dangers as laws that regulate speech based on viewpoint." *Id.* at 2233 (Alito, J., concurring); *see also id.* at 2238 (Kagan, J., concurring) ("[W]e have recognized that such subject-matter restrictions, even though viewpoint-neutral on their face, may 'suggest[ ] an attempt to give one side of a debatable public question an advantage in expressing its views to the people.'") (citation omitted). In making this determination, the court may also consider the law's "stated purposes" and "practical effect." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011).

The civil action provision here singles out speech "bearing a particular message": the identity of state actors or private persons who manufacture, compound, import, transport, distribute, supply, prescribe, prepare, administer, use, or test lethal-injection drugs, equipment, or other related medical supplies. To determine whether a person's identity has been disclosed, one must look to the content of the speech, not simply the time, place, or manner in which it occurs. HB 663 is thus content based on its face.

Even though some of the disclosures barred by HB 663 "could be considered a kind of governmental information," *Sorrell*, 564 U.S. at 568, plaintiffs' challenge to the civil action provision is not reduced to a claim for access to governmental proceedings and information. Where "no private party face[s] a threat of legal punishment," a law may be characterized as "nothing more than a governmental denial of access to information in its possession." *Id.* But where the law "prohibit[s] a speaker from conveying information that the speaker already possesses," and the speaker faces criminal or civil penalties for violating the law, "[a]n individual's right to speak is implicated." *Id.*

By its plain terms, § 2949.221(F) creates a cause of action against any person—whether a state actor *or* a private person or entity—who discloses the identity of a participant in a lethal

injection.**²**   The law does not differentiate based on the source of the information; a private person or entity may be sued even if the disclosed information is obtained by legal means. So, for example, if the employee of a compounding facility discovers rampant violations of Ohio's execution protocol, the employee cannot go public without risking a financially ruinous lawsuit.   Or, if a newspaper publishes an article that links a compounding facility to the manufacture of lethal injection drugs, the compounding facility may sue the newspaper for disclosing its identity—even if the newspaper ascertained this information by legal means.

Plaintiffs' prior-restraint claim also appears viable.   "A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials."  *Bronco's Entm't, Ltd. v. Charter Twp. of Van Buren*, 421 F.3d 440, 444 (6th Cir. 2005).   "It is settled by a long line [of Supreme Court decisions] that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969)).

HB 663 does not create an official system of permits or licenses for disclosing the identities of participants in state executions.   It does, however, immunize persons who disclose such information from a civil action if—and only if—one of the defendants here, the Director of the Ohio Department of Rehabilitation and Corrections, approves the disclosure.   The law does not set forth any criteria for making this determination, nor does it impose any constraint on the Director's exercise of discretion.   It thus appears to invest a government official with "unbridled discretion" to decide who may convey this information.   That is sufficient to state a prior-restraint claim.

---

**²**The district court avoided this question by reading § 2949.221(F) to authorize suit against state actors alone.   This is a strained and, in my view, erroneous interpretation of § 2949.221(F).   Because the majority concludes that plaintiffs do not have standing under either interpretation, that reading does not resolve this issue.

**B. Right of Access to Execution Proceedings and Documents**

The lead opinion concludes that plaintiffs have failed to state a First Amendment claim based on their right of access to execution proceedings and documents. (Maj.Op. at 12.) The majority's analysis turns on its decision to apply *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), rather than the "experience and logic" test set out in *Press-Enterprise Co. v. Superior Court of Cal.*, 478 U.S. 1 (1986). I think it was error to use the *Houchins* analysis. Both Supreme Court and Sixth Circuit precedent indicate that the experience and logic test applies to this case. If that test is used, there is little question that plaintiffs have stated a right of access claim.

1. The experience and logic test applies here.

In *Press-Enterprise Co.*, the Supreme Court announced that the First Amendment right of access applies to a particular proceeding or record if it has "historically been open to the press and the general public" and "public access plays a significant positive role in the functioning of the particular process in question"—and we have adopted that test. *See In re Search of Fair Fin.*, 692 F.3d at 429–30 (citing *Press-Enterprise Co.*, 478 U.S. at 8) (adopting and applying the experience and logic test to an issue of access to documents involving a search warrant). If a proceeding or document "passes this 'experience and logic' test, a qualified right of access attaches to it." *Id.* at 429. Where a qualified right exists, a document may be sealed only if it is "essential to preserve higher values" and is "narrowly tailored" to serve those ends. *Id.*

In *In re Search of Fair Finance*, we explained that though the experience and logic test originated in criminal proceedings, it has been used "to determine whether a First Amendment right of access exists in a wide variety of other contexts," including "whether there is a right of access to civil trials, administrative hearings, deportation proceedings, and municipal planning meetings." *Id.*; *see also Detroit Free Press*, 303 F.3d at 695 (observing that the "experience and logic test" has been applied to a number of different proceedings "outside the criminal judicial context, including administrative proceedings"); *United States v. Miami Univ.*, 294 F.3d 797, 822–23 (6th Cir. 2002) (observing that "[u]niversity disciplinary proceedings are not criminal proceedings," but nevertheless applying the "experience and logic test" to "determin[e] whether a qualified First Amendment right of access attaches"). And, we added, it "has been further

extended beyond hearings and meetings to determine whether there is a First Amendment right of access to documents and other materials." *In re Search of Fair Fin.*, 692 F.3d at 429–30; *see also United States v. DeJournett*, 817 F.3d 479, 484 (6th Cir. 2016) (observing that the Sixth Circuit has applied the experience and logic test to judicial records). Thus, we concluded, it was "appropriate to apply the test . . . in considering whether there should be access to documents involved with the issuing and execution of a search warrant." *In re Search of Fair Fin.*, 692 F.3d at 430. In reaching this conclusion, we "reject[ed] the government's suggestion that there is no First Amendment right of access to search warrant documents . . . due to the fact that the search warrant application process is an investigative rather than a criminal proceeding." *Id.*

If the experience and logic test applies to agriculture department voter lists, university student disciplinary proceedings, municipal planning meetings, and state agency records, *see In re Search of Fair Fin.*, 692 F.3d at 430; *Detroit Free Press*, 303 F.3d at 695, then it applies to execution proceedings and documents. No circuit has concluded otherwise. The only circuit to consider whether the public has a right of access to view executions—the Ninth Circuit—applied the experience and logic test and concluded that "the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 877 (9th Cir. 2002).

All three circuits to address the question in the present case, moreover, have applied the experience and logic test. *See Zink v. Lombardi*, 783 F.3d 1089, 1112–13 (8th Cir. 2015); *Wood v. Ryan*, 759 F.3d 1076, 1081–83 (9th Cir. 2014); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1266 (11th Cir. 2014). The Ninth Circuit held that, under the experience and logic test, the plaintiff had "raised serious questions as to whether a First Amendment right, in the context of a public executions, attaches to the specific information he requests." *Wood*, 759 F.3d at 1086. It thus "grant[ed] a conditional preliminary injunction, staying [the plaintiff's] execution until the State of Arizona has provided him with (a) the name and provenance of the drugs to be used in the execution and (b) the qualifications of the medical personnel." *Id.* at 1088.

The Eighth and Eleventh Circuits applied this test and did not find a right of access. Those cases, however, are distinguishable and do not support the proposition that a right of access is barred as a matter of law. The decision in the Eighth Circuit, *Zink*, turned on pleading deficiencies. *See* 783 F.3d at 1112 (observing that the plaintiffs had "fail[ed] to allege a 'tradition of accessibility' to that information" and "ha[d] not alleged facts or cited authority establishing that the particulars of execution methods have 'historically been open to the press and general public'"). It thus simply stands for the proposition that, when the experience and logic test applies, plaintiffs must set forth allegations that satisfy the test to survive a motion to dismiss.

The decision in the Eleventh Circuit, *Wellons*, held that "the district court did not abuse its discretion in concluding that [the plaintiff] is not entitled to injunctive relief on [the right of access] claims." 754 F.3d at 1267. Crucial to the district court's decision, however, was the fact that the plaintiff had asserted a *personal* rather than *public* right of access: the district court acknowledged "First Amendment implications involved in the openness of government operations," but concluded that "the cases [the plaintiff] relies upon turn on the public's, rather than the individual's, need to be informed so as to foster debate." *Id.* at 1266. Here, by contrast, plaintiffs are raising both their right of access and that of the public.[3]

## 2. The majority's reliance on *Houchins* is misplaced.

In *Detroit Free Press*, we provided three reasons why "*Houchins* [was] not the applicable standard to resolve the First Amendment claim of access" in that case; all apply equally here. *See Detroit Free Press*, 303 F.3d at 694. First, "[t]he issue before the Court in *Houchins . . .* was 'whether the news media have a constitutional right of access to a county jail, *over and above that of other persons*, to interview inmates and make sound recordings, films and photographs for publication and broadcasting by newspapers, radio and television.'" *Id.* (quoting *Houchins*, 438 U.S. at 3). In *Detroit Free Press* and the present case, by contrast, the plaintiffs "do not

---

[3]The procedural posture also makes this case different from *Wellons*. 754 F.3d at 1263. In *Wellons*, the plaintiff needed to show a likelihood of success on the merits; in the present case, plaintiffs need only show that they have pled sufficient allegations to state a claim. *See id.*

claim a 'special privilege of access'" to information about the source of lethal-injunction drugs. *Id.* The plaintiffs here expressly seek access for themselves and the public.

Second, we observed that "*Houchins* rested its holding on the Court's interpretation of the press clause," which is "distinct from the speech clause"—the clause at issue here. *Id.* Indeed, the Supreme Court's "line of cases from *Richmond Newspapers* to *Press-Enterprise II*"—which were decided after *Houchins* and interpreted both the speech and press clauses— "recognize that there is in fact a *limited* constitutional right to *some* government information and also provide a test of general applicability for making that determination." *Id.* at 700.

Third, we questioned whether *Houchins* even remained good law. We pointed to Justice Stevens's concurrence in *Richmond Newspapers*, which emphasized that *Houchins* "represented a plurality opinion of the Court." *Id.* at 694. As such, its conclusions were "neither accepted nor rejected by a majority of the Court." *Id.* Indeed, "[i]n repeatedly applying *Richmond Newspapers*'s two-part 'experience and logic' test," we reasoned, it would seem "clear that the [Supreme] Court has since moved away from its position in *Houchins*." *Id.* at 695. As for the "policy reasons underlying the Court's plurality opinion in *Houchins*," we added, the experience and logic test "sufficiently addresses all of the *Houchins* Court's concerns for the implications of a constitutionally mandated general right of access to government information." *Id.* at 694-95. For all of these reasons, we "question[ed] the vitality of the standard articulated in *Houchins*." *Id.* at 694.

*Houchins* does not control the present case for one more reason: unlike the regulation in *Houchins*, HB 663 shrouds the sources of lethal-injection drugs in absolute secrecy. The Supreme Court has indicated that a regulation that completely bars access is materially distinct from a regulation that only partially restricts access. The *Houchins* Court, for example, took care to emphasize that the regulation did not "prevent [the newspapers] from learning about jail conditions in a variety of ways, albeit not as conveniently as they might prefer." 438 U.S. at 15. It noted that the newspapers could "receive letters from inmates criticizing jail officials and reporting on conditions," could "interview those who render the legal assistance to which inmates are entitled," as well as "seek out former inmates, visitors to the prison, public officials, and institutional personnel . . . ." *Id.* at 14. In specifying these avenues—avenues unavailable

here—the Court cited to an earlier decision in which it expressed skepticism of any "attempt by the State to conceal the conditions in its prisons or frustrate the press' investigation and reporting of those conditions." *Pell v. Procunier*, 417 U.S. 817, 830 (1974).

The *Houchins* Court's analysis was fashioned to address a regulation that only partially restricted access. It effectively concluded that the access already available to the newspapers satisfied the First Amendment. HB 663 presents an entirely different—and more alarming— restriction because "there exist no alternative means . . . to learn about" the source of lethal-injection drugs. *Detroit Free Press*, 303 F.3d at 696 n.12. Our case law teaches that *Houchins* is the wrong framework for this case. Under our precedent, this panel should apply the experience and logic test, the Supreme Court's test for determining whether the public is entitled to access at all. That test is the proper determiner of whether HB 663 is unconstitutional.

### 3. *Wood* does not raise "grave doubts" about plaintiffs' claim.

The lead opinion suggests that the Supreme Court's summary disposition in *Wood* "raises grave doubts as to whether [a right-of-access] claim is legally cognizable in the first place." (Maj.Op. at 14.) This reads too much into the Court's three-sentence order. The plaintiff in *Wood*, a death row inmate scheduled for lethal injection, had requested information from the Arizona Department of Corrections on the source of the lethal-injection drugs that would be used in his execution, information about the qualifications of those persons who would administer the drugs, and information and documents related to how the Department developed its lethal-injection protocol. 759 F.3d at 1079. The Department denied this request and the plaintiff sued, arguing that "by deliberately concealing lethal injection information, the Department ha[d] violated [his] . . . First Amendment . . . right to be informed about the manner in which Arizona implements the death penalty . . . ." *Id.* He requested a preliminary injunction "preventing the Department from carrying out his execution until it provide[d] him with the information he request[ed]." *Id.* The district court denied the preliminary injunction. *Id.*

As discussed above, the Ninth Circuit applied the experience and logic test on appeal and granted a preliminary injunction. *Id.* at 1086–88. Two days later, the full court denied rehearing en banc. Judge Kozinski dissented, concluding that if the plaintiff in *Baze v. Rees*, 553 U.S. 25

(2008), "could not get a stay of execution under the Eighth Amendment," then the plaintiff in *Woods* "certainly is not entitled to one under the First." *Id.* at 1102 (Kozinski, J., dissenting from denial of rehearing *en banc*). Judge Kozinski did not address the underlying merits of the First Amendment right-of-access claim; he addressed only whether the plaintiff was entitled to a stay of execution.[4]

Judge Kozinski's dissent tracked an argument made by Judge Bybee, who dissented from the majority opinion. Judge Bybee argued that even if the plaintiff's First Amendment claim had merit, he was not entitled to a stay of execution:

> No one doubts that [the plaintiff] "has a strong interest in being executed in a constitutional manner." *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011). But the right asserted by [the plaintiff] differs from the constitutional challenges often raised by inmates facing execution. The First Amendment right of public access inheres in all of the members of the public, and not just the inmate who has been sentenced to death . . . . It is not self-evident that the First Amendment right will be irreparably harmed if that information is not disclosed before [the plaintiff's] execution, but is instead disclosed only if the view espoused by [the plaintiff] ultimately prevails after the case is fully litigated. Whatever benefit society derives from being able to discuss who made the drug and who injected it would presumably still inure to the public if that conversation occurred after [the plaintiff] has been executed.

*Id.* at 1100–01 (Bybee, J., dissenting). Notably, the majority itself acknowledged that "[t]here are special considerations in a capital case when a plaintiff requests a stay of execution," that the government has a "strong interest in enforcing its criminal judgments," and that "filing an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." *Id.* at 1080.

In a three-sentence order issued on July 22, 2014—one day before the plaintiff's scheduled execution—the Supreme Court vacated the Ninth Circuit's judgment granting a conditional preliminary injunction. *Ryan v. Wood*, 135 S. Ct. 21 (2014). The Court did not address the merits of the plaintiff's underlying First Amendment claim. Rather, the Court appears to have concluded, as did Judge Kozinski, that even if an inmate has a viable First

---

[4]The other dissenters questioned the majority's application of the experience and logic test (as well as the standard for granting a preliminary injunction), but did not argue that the experience and logic test did not apply. *Id.* at 1103–05 (Callahan, J., dissenting).

Amendment right-of-access claim, this claim is insufficient to grant a stay of execution. The Court's summary disposition in *Wood* does not raise "grave doubts" about whether plaintiffs' First Amendment right-of-access claim is legally cognizable.

4.  Plaintiffs' allegations state a First Amendment right-of-access claim.

Plaintiffs satisfy both parts of the experience and logic test. First, their complaint sets forth a number of allegations that the proceeding or record has "historically been open to the press and the general public," *In re Search of Fair Fin.*, 692 F.3d at 429, including:

- The information necessary to refute the misconception that lethal injection provides an "enviable" "quiet death" has come from various traditionally open sources and proceedings including litigation/evidentiary hearings, discovery, public records requests, media reports, and investigations, among other sources. (R. 1, PageID 17, ¶ 55.)

- There is no history or tradition—let alone a long history or tradition—in Ohio of restricting speech against those persons and entities who have chosen, for their own personal, political, economic, or other reasons, and who are compensated for their participation, to supply drugs and other essential execution supplies or to otherwise perform professional services for purposes of lethal injection executions. To the contrary, in fact, there is a history of openness in Ohio's execution process. (R. 1, PageID 52, ¶ 148.)

- Key participants have always been subject to public scrutiny and their identities never shielded, with the exception of some DRC employees actually on the execution team (for whom existing protections, even if proper, are already sufficient without HB 663). For example, the identities of the following direct and indirect participants in Ohio's lethal injection executions have never been shielded but would be now under the Challenged Provisions of HB 663: (i) medical and other experts and consultants retained by the State; (ii) drug suppliers and pharmacists used by the State for securing the execution drugs; (iii) doctors, nurses, and mental health professionals conducting the required checks and assessments on an inmate in the minutes, hours and days leading up to an execution; (iv) doctors and nurses directly participating in executions (including, for example, the doctor who participated in [the] attempted execution [of death row inmate Romell Broom]); (v) doctors assessing the inmate's status during an execution and pronouncing death; (vi) pharmacists, lawyers, and other professionals involved in providing the required periodic trainings and rehearsals for the execution team members; and (vii) many other direct participants in executions including DRC upper management personnel at levels below the director, DRC lawyers (e.g., during Broom's attempted execution), DRC's spokespersons and press officers, and the DRC employees who create the contemporaneous execution

timeline for an execution or otherwise generate documents related to administration of the execution protocol. (R. 1, PageID 52–53, ¶ 149.)

- This public right of access has constitutional protection because . . . executions and associated documents and information have historically been open to the press and general public, in Ohio and in other states . . . . (R. 1, PageID 64, ¶ 204.)

Plaintiffs' complaint also sets forth a number of allegations that "public access plays a significant positive role in the functioning of the particular process in question," *In re Search of Fair Fin.*, 692 F.3d at 429, including:

- This public right of access has constitutional protection because . . . the public access plays a significant positive role in the functioning of the execution process. (R. 1, PageID 64–65, ¶ 204.)

- An informed public debate is critical in determining whether a specific execution method comports with this country's evolving standards of decency, and even more so at this time in history where, for reasons addressed throughout this Complaint, there is intense public interest in whether lethal injection is capable of being administered in a humane manner. (R. 1, PageID 65, ¶ 205.)

- Given the factual backdrop of the many recent botched executions and the unavailability of execution drugs manufactured by the companies of big-Pharma, more information about the drugs used in lethal injections can help an alert public make more informed decisions about the evolving standards of decency in this country surrounding lethal injection. Knowing the source of the drugs, and the qualifications, credentials, competence, protocols, and reputation of the drug makers and other professionals involved in the execution process, among other information, allows the public to discern whether Defendants are using safe and reliable drug manufacturers, and would give the public the basic confidence, beyond the State's generic assurances, that executions will be administered safely and pursuant to certain qualifications and standards. (R. 1, PageID 65, ¶ 206.)

Finally, plaintiffs allege that the Ohio secrecy law is not justified by a compelling interest, and that the law is not narrowly tailored. Because these allegations are sufficient to state a First Amendment right-of-access claim, I would reverse the district court's order dismissing this claim.

**C. Procedural Due Process**

The lead opinion disposes of plaintiffs' due process claim in a single paragraph, citing to cases in which inmates have raised a constitutional right of access to the courts. Specifically, the

majority points to *Lewis v. Casey*, 518 U.S. 343 (1996), where the Supreme Court held that an inmate's right of access to courts does not include conferral of "sophisticated legal capabilities." *Id.* at 354. Inmates have a right to the resources "need[ed] in order to attack their sentences . . . and . . . challenge the conditions of their confinement," the Court explained, but the Constitution "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id.* at 355.

This is not a case about extraneous litigation: it is a case about death-sentenced inmates seeking information required "in order to attack their [death] sentences." *Id.* The appropriate analysis of plaintiffs' due process claim employs the procedural due process framework set forth in the line of cases beginning with *Goldberg v. Kelly*, 397 U.S. 254 (1970), and *Mathews v. Eldridge*, 424 U.S. 319 (1976). This framework is outlined in detail in *Jones v. Commissioner*, 812 F.3d 923 (11th Cir. 2016), where a bare majority of judges—six of the Eleventh Circuit's eleven judges—voted to deny rehearing *en banc* of a decision upholding Georgia's Lethal Injection Secrecy Act. Four dissenting judges joined Judge Wilson's excellent dissent, which concludes that the Eleventh Circuit's rejection of "due process challenges to the Secrecy Act without applying [the *Goldberg* and *Mathews* procedural due process] framework" is "legal error" that "is fatal to [its] jurisprudence." *Id.* at 935 (Wilson, J., dissenting). The majority here makes the same error.

Procedural due process analysis proceeds in two steps. First, the court must determine "[w]hether any procedural protections are due," which "depends on the extent to which an individual will be 'condemned to suffer grievous loss.'" *Morrissey v. Brewer*, 408 U.S. 471, 481, 483–90 (1972) (specifying minimum due process requirements for parole revocation). "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221, 224 (2005) (finding a protected liberty interest in avoiding state assignment to a supermax prison). Thus, the Due Process Clause requires procedural protections when the loss is both weighty and "within the

contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Morrissey*, 408 U.S. at 481.

Once the court determines that an interest is entitled to procedural protections, "the question remains what process is due." *Id.* To answer this question, the court "evaluate[s] the sufficiency of particular procedures" using the framework set forth in *Mathews*, which entails weighing the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224–25.

In the present case, the interest at stake is the right to be executed in a manner that comports with the Eighth Amendment's prohibition on "cruel and unusual punishments." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015). As Judge Wilson observes in his dissent in *Jones*, the Supreme Court has recognized far less weighty interests as "grievous losses" entitled to procedural protections, such as property interests in continuing civil servant employment and receiving public utilities. *See Jones*, 812 F.3d at 937–38 (Wilson, J., dissenting). A prisoner's "right to be free from an unconstitutional invasion of his body is a liberty interest under the Fourteenth Amendment." *Jones,* 812 F.3d at 938 (citing *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891); *Washington v. Harper*, 494 U.S. 210, 229 (1990) (holding that "[t]he forcible injection of medication into a nonconsenting [prisoner's] body represents a substantial interference with that person's liberty" under the Fourteenth Amendment)). To vindicate this interest, an inmate must have a fair opportunity to challenge unconstitutional methods of execution. *See Hall v. Florida*, 134 S. Ct. 1986, 2001 (2014) ("The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution.") American jurisprudence has long recognized the "heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life . . . ." *Ford v. Wainwright*, 477 U.S.

399, 410, 414 (1986) (holding that the Eighth Amendment prohibits inflicting the death penalty on a prisoner who is insane). The plaintiffs are thus entitled to procedural protections that guarantee "the basic ingredient of due process, namely, an opportunity to be allowed to substantiate a claim before it is rejected." *Id.*

The next question, then, is whether HB 663 deprives plaintiffs of procedural protections to which they are entitled. To make this determination, the court must weigh the *Mathews* factors. Plaintiffs have alleged that "[b]y concealing critical information about the specific drugs the State intends to use to execute [them]," HB 663 "frustrates [their] ability to fairly and effectively litigate their claims relating to the constitutionality of their executions by lethal injection," and thus "denies Plaintiffs their rights not to be deprived of their lives without due process of law." (R. 1, PageID 62–63, ¶¶ 196, 198.)[5] Indeed, the district court itself acknowledged that HB 663 would "unquestionably handicap[] Plaintiffs' pursuit of their protocol challenge in related litigation." *Phillips v. DeWine*, 92 F. Supp. 3d 702, 716 (S.D. Ohio 2015). Noting that the harsh result from its decision "is a matter of some unease," the court explained,

> In execution protocol challenges, the law tells death-sentenced inmates to bring evidence into the courtroom while concurrently upholding a scheme that places the bulk of select evidence outside the reach of the inmates. The necessary is also the withheld: *you must give us that which you cannot have to give.* In order to challenge the use of a drug that will be used to execute them, inmates must explain why use of that drug presents a risk of substantial harm. But the inmates are not allowed to know from where the drug came, how specifically it was manufactured, or who was involved in the creation of the drug.

*Id.* at 716–17. Plaintiffs have thus properly alleged a life or liberty interest in a constitutional execution, protected by due process requirements, and that their interest is placed at risk of erroneous deprivation by HB 663.

I agree with Judge Wilson and the four judges who joined him that "[i]t is simply not difficult to conceive of a cost-effective procedure through which [Ohio] may account for death row prisoners' due process rights while protecting its stated interests" in "continuing to

---

[5]In their parallel suit against Ohio's execution protocol, *In re Ohio Execution Protocol* (16-3149), plaintiffs explain at length how this secrecy undermines their constitutional claims.

administer capital punishment in a fiscally and administratively viable manner." *Jones*, 812 F.3d at 940. For example, Ohio could ban public release of the information, but provide prisoners limited access under protective order. *Id.* Based on the allegations in the complaint, then, I think that the *Mathews* factors weigh heavily for the plaintiffs and they have stated a due process claim.

**D. CONCLUSION**

The decision today undermines constitutional protections in several particulars. It denies standing to bring a First Amendment claim based on the right to receive information, barring the plaintiffs from obtaining information essential to pursuit of their claims and denying the public information necessary to, and historically used for, developing the evolving standards of decency that govern our society and should inform our law. Second, it denies the plaintiffs' First Amendment claim to right of access to execution proceedings and documents, a claim fairly stated under the applicable experience and logic test. Finally, it fails our due process test: it rejects a claim without providing (actually while prohibiting) an opportunity to prove it.

The complaint properly alleges speech that speakers desire to utter and both the plaintiffs and the public desire to hear. It alleges that HB 663 is a direct reaction to anti-death-penalty speech that historically has been available to the public—speech that had proven successful in the court of public opinion. And it alleges the inherent wrong of imposing evidentiary standards an inmate must meet to protect his right to be executed in compliance with the Eighth Amendment, then denying him the opportunity to challenge secrecy laws that prohibit him, or anyone on his behalf, from obtaining that information. It is simply not enough to acknowledge "unease" with or the "absurdity" of that constitutional catch 22. And there is no need here to engage in such conscience-soothing rhetoric because plaintiffs' allegations state a claim.

Death penalty cases are not just about punishing a convicted person. These cases are also about protecting the functioning of our justice system, which for the reasons stated above envisions a forum for addressing the claims made in this litigation, and perhaps other litigation over state lethal injection secrecy laws. It is my belief that our criminal justice system does—and should—provide death-sentenced inmates a fair opportunity "to show that the

Constitution prohibits their execution" before we reject their claims. *See Hall*, 134 S. Ct. at 2001.

Accordingly, I respectfully dissent.