**COMPETITIVE ENTERPRISE INSTITUTE, Fred L. Smith, Jr. and Glenda Hill, Petitioners,**

v.

**U.S. DEPARTMENT OF TRANSPORTATION, Respondent.**

No. 87–1640.

United States Court of Appeals, District of Columbia Circuit.

Argued May 13, 1988.

Decided Sept. 23, 1988.

Sam Kazman, Washington, D.C., for petitioners.

Robert D. Young, Atty., U.S. Dept. of Transp., with whom B. Wayne Vance, Gen. Counsel, and Kenneth N. Weinstein, Deputy Asst. Gen. Counsel, U.S. Dept. of Transp., and Robert B. Nicholson and Laura Heiser, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondent.

Before WALD, Chief Judge, and STARR and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Petitioners seek review of the Department of Transportation's regulations setting standards for the computerized systems used by travel agencies to make airline reservations. Because we conclude that petitioners' alleged injuries are neither caused by the challenged regulation nor would be redressed by the relief they seek, we find that petitioners lack standing and therefore dismiss the petition.

## I. BACKGROUND

There are five computerized reservation systems ("CRSs") in use today, each owned by one or more airlines ("system owners"): American Airlines' Sabre, Delta's Data II, Texas Air's SystemOne, United's Apollo, and Pars, owned jointly by Trans World and Northwest Airlines. Each CRS consists of a central computer database that is connected to terminals in participating travel agencies. These databases contain complete information about all scheduled airline flights. By using one of these systems, a travel agent can obtain data on flight availability, make reservations, and purchase tickets for flights on most airlines. Over ninety percent of all U.S. airline tickets are purchased through the five CRSs.

To use a CRS, an agent enters the point of origin, the destination, and the preferred date and time of travel. The computer terminal screen responds with a "primary display," a series of one-line listings of all flights meeting the trip requirements. The CRS ranks the listings in an order determined by the algorithms in the computer program. If the agent cannot find an appropriate flight on the primary screen, he can push a button and go to the next screen. If the agent wishes more elaborate information about a particular flight than appears in the one-line listing on the primary display, he can ask the CRS to show a "secondary display."

In 1984, the Civil Aeronautics Board ("CAB"), the predecessor to the Department of Transportation ("DOT") in regulating airline competition, became concerned that system owners were taking advantage of their control of CRS programming to give their own airlines a competitive edge. The CAB discovered, for example, that certain system owners had written the computer program algorithms in such a manner that their CRS screens would display all of their own flights before listing those

of competitors, even though other flights might more closely match the agents' specifications. Because travel agents work under heavy time pressures, they tend to recommend the flights listed first. To eliminate such practices, the CAB adopted a final rule, 14 C.F.R. pt. 255 (1988), that requires that the CRS algorithms generate primary displays based on "neutral" characteristics. *See id.* § 255.4(b). Secondary displays, which are infrequently consulted by travel agents, were left unregulated. The Seventh Circuit upheld these rules against a challenge by the airline industry. *United Air Lines, Inc. v. CAB*, 766 F.2d 1107 (7th Cir.1985).

In early 1987, the DOT became concerned over passenger complaints of excessive delays in scheduled flights. It determined that airlines were listing unrealistically short elapsed flight times. Furthermore, it found that many airlines were scheduling more departures and arrivals in popular time slots than the airports could reasonably accommodate. To limit these as well as other practices, the DOT adopted the regulations at issue in this case. 52 Fed.Reg. 34,056 (1987) (codified at 14 C.F.R. pt. 234 & §§ 255.3 & 255.4 (1988)).

The rule requires carriers to include, in their one-line primary display for each flight, a one-digit "on-time performance code" reflecting the flight's on-time arrival record, "on-time" being defined as arrival at the gate within fifteen minutes of schedule. 14 C.F.R. §§ 255.4(e)(1), 234.8 & 234.2 (1988). The digit "9," for example, would represent that the flight had arrived on time at least ninety percent of the time during the prior month. *Id.* § 234.8(b)(2) & (c). The rule further provides that this performance code is the *only* information regarding schedule performance that may appear in the primary display. *Id.* § 255.4(e); 52 Fed.Reg. at 34,068. Additional on-time performance information may appear only in the secondary displays and only if based on data reported according to the DOT's rules. *See id.* § 255.4(e)(1) & (3); 52 Fed.Reg. at 34,068.

These requirements are challenged by the following petitioners: The Competitive Enterprise Institute ("CEI"), an organization interested in regulatory matters, which participated in the DOT's Notice and Comment proceedings and asserts that the rule hinders its ability to make airline reservations and to obtain data for use in analyzing airline regulation; Fred L. Smith, Jr., president of the CEI, who claims that the rule limits his ability to use CRSs to make flight reservations; and Glenda Hill, a travel agent, who alleges that the rule hinders her ability to make reservations for her clients. No airline or system owner has appeared before the court to challenge these regulations.

Reduced to essentials, petitioners complain that the agency's rule injures them in three distinct ways. First, the mandatory inclusion of the one-digit performance code displaces information that would otherwise be included in the primary display. Second, the rule intrudes on the system owners' right to use the performance codes in the CRS algorithms to rank flights in the primary display on the basis of their on-time performance. Third, the rule bars use of any on-time performance information that is not based on information reported to the DOT. Petitioners do not ask us to require the DOT to adopt regulations that would *mandate* the inclusion of information in the CRSs; rather, they ask that we order the DOT not to *bar* system owners and airlines from deciding what information is to be provided by the CRSs.

## II. Discussion

■ Petitioners do not have a right to seek court review of administrative proceedings merely because they participated in them. Unlike an agency, our authority to hear a case is limited by the standing requirements of the United States Constitution. In order to establish standing, petitioners must, at a minimum, demonstrate that (1) they suffer an injury-in-fact, (2) the injury is fairly traceable to (i.e., caused by) the challenged regulation, and (3) it is likely to be redressed by the remedy they seek. *Valley Forge Christian College v. Americans United for Separation of Church &*

*State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982).

In this case, petitioners assert that the rule interferes with their right to "hear" information from "speakers" (i.e., the system owners and the airlines) who are subject to its provisions. They ask that we void these restraints on the system owners' and airlines' freedom to speak, not that we mandate regulations that would require them to speak. Absent evidence that the system owners or the airlines wish to say what petitioners would like to hear, however, we cannot assume that the regulations cause petitioners any harm. Moreover, absent such evidence, merely voiding the challenged rule will not ensure that any system owner or airline would provide the information petitioners wish to have.

It is well established that petitioners, as listeners, can suffer injury from government regulations that prevent speakers from saying what the listeners wish to hear. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). While the Court acknowledged, in *Virginia Pharmacy,* that listeners deprived of their right to information can suffer cognizable injury, it noted that "the protection afforded is to the communication, to its source and to its recipients both." Accordingly, "[f]reedom of speech presupposes a willing speaker." *Id.* at 756, 96 S.Ct. at 1823 (footnote omitted); *see also Virginia v. American Booksellers Ass'n,* — U.S. ——, 108 S.Ct. 636, 642, 98 L.Ed. 2d 782 (1988).

Whether the injury is phrased as a deprivation of information that the listener would find useful or the interference with a relationship between speaker and listener, a government regulation cannot cause that injury unless petitioners can identify a willing speaker. Otherwise, an Article III court must dismiss the action for lack of standing. *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1211–12 (5th Cir.1982) ("Recipients of protected communication have standing only if there is a speaker who wishes to express himself or herself."); *see also Frissell v. Rizzo,* 597 F.2d

840, 847–48 (3d Cir.) ("the hearer [must] demonstrate injury to a relationship with an affected speaker"), *cert. denied,* 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Gregg v. Barrett,* 771 F.2d 539, 547–48 (D.C.Cir.1985) ("The right to receive information, however, is not established in every case where a person wishes to receive information."). As we demonstrate below, petitioners' citations to the administrative record notwithstanding, the record fails to demonstrate that any airline or CRS would provide the information petitioners would like to receive.

In support of its first claim of injury, *viz.,* the displacement, by the on-time code, of information that would otherwise appear in the primary display, petitioners cite to comments filed by American Airlines during the DOT proceedings. In those comments, American stated that if the on-time performance code were restricted to one space, it could incorporate the code in its CRS's one-line primary display, although at some cost. It noted, however, that the other four systems should find it easier to do so because while American used only one space to provide information about in-flight meals, the other four systems used two or more spaces in order to indicate meals by class of service. Thus, if they also adopted one-space meal indicators, they could more readily accommodate a one-space performance code.

Petitioners seized on this information to argue that because the other CRS vendors had found it desirable to use two-space codes to report meals by class, the on-time code requirement would deprive them of the opportunity to provide the public with the additional information. Petitioners' argument, however, is entirely speculative. They produced no evidence that the other system owners either cut back on the information made available to the public or, if they did, that they had any wish to restore the displaced data.

Petitioners provide even less support for the claim that they have been injured by the DOT's prohibition of the use of performance codes to rank flights on the basis of punctuality. Instead of trying to meet

the DOT's entirely valid argument that petitioners have failed to demonstrate that a willing speaker exists, they engage in an irrelevant attack on the logic of the DOT rule. Their final claim of injury, that the DOT will not allow the CRSs to display "other information" not reported to it, fails for the same reason: no evidence of a willing speaker.

In an effort to circumvent the willing speaker requirement, petitioner Hill asserts that as a professional user, her interest in the information appearing on CRS screens is as great as that of the viewers who had been found to have standing to challenge a TV license renewal application in *Office of Communication of United Church of Christ v. FCC*, 359 F.2d 994, 1002 (D.C.Cir. 1966). The licensee in that case allegedly practiced "discriminatory programming" by failing to "give a fair and balanced presentation of controversial issues, especially those concerning Negroes, who compris[ed] almost forty-five per cent of the total population within its prime service area." 359 F.2d at 998 & 1000. The court focused on petitioners' right to "vindicate the broad public interest relating to a licensee's performance of the public trust inherent in every license." *Id.* at 1006.

The analogy petitioners suggest is inappropriate. *Office of Communication* centered on the nature of the asserted injury in the specific context of the Communications Act of 1934. *See* 359 F.2d at 1000–01. Furthermore, the court's discussion of consumer standing was directed not to whether petitioners had been deprived of information they sought, but whether the licensee had failed to meet its obligations to the public, including the obligation, under the FCC's Fairness Doctrine, to provide viewers with a balanced discussion of matters of significant public interest. *Id.* at 998–99. Although the court did not expressly discuss causation and redressability, both

elements of standing were clearly present. The *Office of Communication* petitioners alleged that their injury was caused by the licensee's failure to meet its obligations; the termination of its license would redress that injury. These circumstances have no parallel in the case before us.

CEI relies on *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931 (D.C.Cir. 1986), to support a claim of organizational standing because the regulations purportedly interfere with its organizational purpose of monitoring and commenting on airline deregulation. In *Action Alliance*, we held that petitioners had standing to compel the release of information required by the organization to achieve its objectives. CEI's reliance on *Action Alliance* is unavailing because it does not seek the adoption of regulations mandating that particular data be provided by the CRSs. It only seeks to preserve the system owners' and the airlines' freedom to include more data than the regulations allow.

### III. CONCLUSION

Petitioners have pointed to a constitutionally cognizable type of injury—their members are willing listeners unable to hear commercial speech. But they have failed to establish that the challenged regulations prevent otherwise willing speakers from speaking. As petitioners have failed to satisfy the causation and redressability elements of the standing test, the petition for review is

DISMISSED.