JANE B. STRANCH, Circuit Judge,
dissenting.
In January 2014, Ohio executed Dennis McGuire with a lethal injection of midazo-lam and hydromorphone. At the time, no state had ever attempted an execution with this combination of drugs. McGuire’s lawyers tried to stay the execution, arguing— unsuccessfully—that the untested method presented a substantial risk of causing McGuire severe pain, and thus violated the Eighth Amendment. The State of Ohio *421 promised a painless execution, pointing to the testimony of an anesthesiologist who, in the months after the execution, would decide to terminate his contract with the state. It took 25 minutes for McGuire to die, and witnesses reported that “[t]he process ... was accompanied by movement and gasping, snorting and choking sounds.” Erica Goode, After a Prolonged Execution in Ohio, Questions Over ‘Cruel and Unusual’, N.Y. Times, January 17, 2014, at A12. The priest who accompanied McGuire would later write, “I came out of that room feeling that I had witnessed something ghastly.”
This horrifying tale of an execution gone wrong underscores what is at stake in this litigation. Ohio has not carried out an execution since it botched McGuire’s, in part because it has been unable to obtain the drugs needed for lethal injection. Plaintiffs, inmates under death sentence, attribute this to successful public advocacy: “Speech opposed to lethal injection as a means of capital punishment has persuaded various actors essential to that process to cease their participation.... ” HB 663 is the Ohio legislature’s answer to this problem. Plaintiffs allege that HB 663 silences their side of the public debate by assuring that the identities of all participants in an execution, particularly the drug manufacturers, will be strictly confidential—anonymity enforced through punitive civil sanctions against anyone who discloses their identities. Plaintiffs challenge the constitutionality of HB 663.
There can be no doubt: HB 663 will obstruct scrutiny of Ohio’s execution protocol. I find this deeply troubling. We must not forget that, just four years ago, based on Ohio’s “persistent failure or refusal ... to follow its own written execution protocol,” we found it necessary “to monitor every execution on an ad hoc basis” because Ohio could not be “trusted to fulfill its otherwise lawful duty....” In re Ohio Execution Protocol Litig,, 671 F.3d 601, 602 (6th Cir. 2012). HB 663 will impede both discovery and monitoring of the violations that we condemned.
The lead opinion affirms dismissal of plaintiffs’ various claims based on standing or failure to state a claim. So we do not reach the constitutionality of HB 663 today, though I admit great misgivings about this law. Instead, we address a more limited question: Did the district court commit error by foreclosing this constitutional inquiry before it was underway?
. Yes, in three respects. First, the district court wrongly concluded that plaintiffs lacked standing to challenge the civil action .provision. Specifically, plaintiffs have standing to raise their First Amendment right to receive information under Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Second, in evaluating plaintiffs’ First Amendment right of access to execution proceedings and documents, the district court failed to apply the Supreme Court’s “experience and logic” test. See In re Search of Fair Fin., 692 F.3d 424, 429-30 (6th Cir. 2012); Detroit Free Press v. Ashcroft, 303 F.3d 681, 695 (6th Cir. 2002). Applying the proper test, plaintiffs’ allegations are more than sufficient to state a claim. Lastly, the district court dismissed plaintiffs’ due process claim prematurely. While plaintiffs may not state a due process claim under an aceess-to-courts theory, they can do so under a procedural due process theory. I therefore respectfully dissent.
A. Standing
The lead opinion concludes that plaintiffs do not have standing to challenge HB 663’s civil action provision. This provision allows any person or entity who has par *422 ticipated in an Ohio execution—including private persons who manufactured, compounded, imported, transported, distributed, supplied, prescribed, prepared, administered, used, or tested lethal-injection drugs, equipment, or other related medical supplies—to bring “a civil cause of action against any person who discloses [their] identity and participation in the activity.” Ohio Rev. Code § 2949.221(F). The .majority observes that “[pjlaintiffs have not argued that they have information they are prevented from disclosing”—that is, they have not alleged that the civil-action provision deters them from speaking. (Maj. Op. at 415.) Thus, the majority concludes, plaintiffs “are not part of the group whose conduct the provision[] govern[s]” and “cannot claim standing as the ‘objects’ of HB 663....” (Id.)
I disagree. It is true that plaintiffs have not alleged that the civil action provision deters them from disclosing information. But the Supreme Court has long recognized that, in addition to the right to speak, the First Amendment demands a corollary right to receive information and ideas. See Va. State Bd. of Pharmacy, 425 U.S. at 756-57, 96 S.Ct. 1817 (citing “numerous” Supreme Court decisions acknowledging the right to receive information and ideas); Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 386-87, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (Rehnquist, J., concurring) (“Our decisions have concluded that First Amendment protection extends equally to the right to receive information_”). The right to receive information “follows ineluctably” from' the speaker’s right to communicate information and, “[m]ore importantly, .., is a necessary predicate to the recipient’s meaningful exercise of his own rights of speech, press, and political freedom.” Bd. of Educ. v. Pico, 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). It is derived, in other words, from the First Amendment’s role “not only ... in fostering individual self-expression but also ... in affording the public access to discussion, debate, and the dissemination of information and ideas.” Id. at 866, 102 S.Ct. 2799.
To have standing to raise a right to receive information claim, a plaintiff must allege that, but for the challenged restriction, a person would be willing to speak. A willing speaker engenders protection beyond his own voice. “Freedom of speech presupposes a willing speaker. But where a speaker exists, ... the protection afforded is to the communication, to its' source and to its recipients both.” Va. State Bd. of Pharmacy, 425 U.S. at 756, 96 S.Ct. 1817; see also Am. Civil Liberties Union v. Holder, 673 F.3d 245, 255 (4th Cir. 2011) (observing that the First Amendment “provides standing to persons who are ‘willing listeners’ to a willing speaker who, but for the restriction, would convey information”); United States v. Wecht, 484 F.3d 194, 203 (3d Cir. 2007), (concluding that a third party has standing to raise a right to receive information claim “as long as the third party can demonstrate that an individual subject to the [challenged restriction] would speak more freely if the [restriction] is lifted or modified”); Competitive Enter. Inst. v. U.S. Dep’t of Transp., 856 F.2d 1563, 1566 (D.C. Cir. 1988) (“It is well established that petitioners, as listeners, can suffer injury from government regulations that prevent speakers from saying what the listeners wish to hear.”); In re Dow Jones & Co., Inc., 842 F.2d 603, 606-08 (2d Cir. 1988) (same). “The purpose of the ‘willing speaker’ requirement ... is ... to ensure that there is an injury in fact that would be redressed by a favorable decision.” Wecht, 484 F.3d at 203.
In the present case, plaintiffs allege that “[i]t sometimes happens that persons who have participated in lethal injection execu *423 tions will, upon ceasing their participation for whatever reason, come to believe from the perspective of their first-hand' experience in the process that the death penalty is flawed and should no longer be used.” (R. 1, PagelD 41, ¶ 106(g).) Plaintiffs put flesh on that claim by identifying “two former recent directors” of the Ohio Department of Rehabilitation and Corrections and “a recent former Ohio Attorney General” as persons who “have experienced such a conversion.” (Id.) By imposing “severe financial penalties,” plaintiffs allege, HB 663 “chills the speech of those, participants or former participants, in Ohio lethal injection executions who experience such a conversion, with the effect being that such persons who would otherwise be willing to speak publicly about their experiences will not be willing to do so....” (Id.) Plaintiffs have alleged the existence of willing speakers who, but for the civil penalty provision, “would speak more freely.” Wecht, 484 F.3d at 203; see also FOCUS v. Allegheny Cty. Court of Common Pleas, 75 F.3d 834, 839 (3d Cir. 1996) (concluding that it is “reasonable to infer” from allegations that litigants “were willing to talk at some point prior to the entry of the gag orders” that they “are willing but restrained speakers”); In re Dow Jones & Co., 842 F.2d at 607 (concluding that “[i]t is hard ... to imagine that there are no willing speakers” because “[wjithout them there would be no need for a restraining order”). At this stage of the litigation, that is sufficient to establish plaintiffs’ standing to raise a right to receive information claim.
Once standing is established, plaintiffs allege a viable' claim that the’ civil action provision- is an unconstitutional content-based speech restriction.[1] “Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.” Reed v. Town of Gilbert, — U.S. --, 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015). A court should “consider whether a regulation of speech ‘on its face’ draws distinction based on the message a speaker conveys.” Id. Facially content-based laws are subject to strict scrutiny. Id. • This is because “[limiting speech based on its ‘topic’ or ‘subject’ favors those who. do not want to disturb the' status quo,” and thus poses “the same dangers as laws that regulate speech based on viewpoint.” Id. at 2233 (Alito, J., concurring); see also id. at 2238 (Kagan, J., concurring) (“[W]e have recognized that such subject-matter restrictions, even though viewpoint-neutral on their face, may ‘suggest[] an attempt to give one side of a debatable public question an advantage in expressing its- views to the people.’ ”) (citation omitted). In making this determination, the court may also consider the law’s “stated purposes” and “practical effect.” Sorrell v. IMS Health Inc., 564 U.S. 552, 565, 131 S.Gt. 2653, 180 L.Ed.2d 544 (2011).
The civil action provision here singles out speech “bearing a particular message”: the identity of state actors or private persons who manufacture, compound, import, transport, distribute, supply, prescribe, prepare, administer, use, or test lethal-injection drugs, equipment, or other related medical supplies. To determine whether a person’s identity has been disclosed, one must look to the content of the speech, not simply the time, place, or manner in which it occurs. HB 663 is thus content based on its face.
*424 Even though some of the disclosures barred by HB 663 “could be considered a kind of governmental information,” Sorrell, 564 U.S. at 568, 131 S.Ct. 2653, plaintiffs’ challenge to the civil action provision is not reduced to a claim for access to governmental proceedings and information. Where “no private party face[s] a threat of legal punishment,” a law may be characterized as “nothing more than a governmental denial of access to information in its possession.” Id. But where the law “prohibit[s] a speaker from conveying information that the speaker already possesses,” and the speaker faces criminal or civil penalties for violating the law, “[a]n individual’s right to speak is implicated.” Id.
By its plain terms, § 2949.221(F) creates a cause of action against any person— whether a state actor or a private person or entity—who discloses the identity of a participant in a lethal injection.[2] The law does not differentiate based on the source of the information; a private person or entity may be sued even if the disclosed information is obtained by legal means. So, for example, if the employee of a compounding facility discovers rampant violations of Ohio’s execution protocol, the employee cannot go public without risking a financially ruinous lawsuit. Or, if a newspaper publishes an article that links a compounding facility to the manufacture of lethal injection drugs, the compounding facility may sue the newspaper for disclosing its identity—even if the newspaper ascertained this information by legal means.
Plaintiffs’ prior-restraint claim also appears viable. “A ‘prior restraint’ exists when the exercise of a First Amendment right depends on the prior approval of public officials.” Bronco’s Entm’t, Ltd. v. Charter Twp. of Van Buren, 421 F.3d 440, 444 (6th Cir. 2005). “It is settled by a long line [of Supreme Court decisions] that an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.” FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)).
HB 663 does not create an official system of permits or licenses for disclosing the identities of participants in state executions. It does, however, immunize persons who disclose such information from a civil action if—and only if—one of the defendants here, the Director of the Ohio Department of Rehabilitation and Corrections, approves the disclosure. The law does not set forth any criteria for making this determination, nor does it impose any constraint on the Director’s exercise of discretion. It thus appears to invest a government official with “unbridled discretion” to decide who may convey this information. That is sufficient to state a prior-restraint claim.
B. Right of Access to Execution Proceedings and Documents
The lead opinion concludes that plaintiffs have failed to state a First Amendment claim based on their right of access to execution proceedings and documents. *425 (Maj. Op. at 417.) The majority’s analysis turns on its decision to apply Houckins v. KQED, Inc., 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), rather than the “experience and logic” test set out in Press-Enterprise Co. v. Superior Court of Cal., 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). I think it was error to use the Houckins analysis. Both Supreme Court and Sixth Circuit precedent indicate that the experience and logic test applies to this case. If that test is used, there is little question that plaintiffs have stated a right of access claim.
1. The experience and logic test applies here.
In Press-Enterprise Co., the Supreme Court announced that the First Amendment right of access applies to a particular proceeding or record if it has “historically been open to the press and the general public” and “public access plays a significant positive role in the functioning of the particular process in question”—and we have adopted that test. See In re Search of Fair Fin., 692 F.3d at 429-30 (citing Press-Enterprise Co., 478 U.S. at 8, 106 S.Ct. 2735) (adopting and applying the experience and logic test to an issue of access to documents involving a search warrant). If a proceeding or document “passes this ‘experience and logic’ test, a qualified right of access attaches to it.” Id. at 429. Where a qualified right exists, a document may be sealed only if it is “essential to preserve higher values” and is “narrowly tailored” to serve those ends. Id.
In In re Search of Fair Finance, we explained that though the experience and logic test originated in criminal proceedings, it has been used “to determine whether a First Amendment right of access exists in a wide variety of other contexts,” including “whether there is a right of access to civil trials, administrative hearings, deportation proceedings, and municipal planning meetings.” Id.; see also Detroit Free Press, 303 F.3d at 695 (observing that the “experience and logic test” has been applied to a number of different proceedings “outside the criminal judicial context, including administrative proceedings”); United States v. Miami Univ., 294 F.3d 797, 822-23 (6th Cir. 2002) (observing that “[ujniversity disciplinary proceedings are not criminal proceedings,” but nevertheless applying the “experience and logic test” to “determin[e] whether a qualified First Amendment right of access attaches”). And, we added, it “has been further extended beyond hearings and meetings to determine whether there is a First Amendment right of access to documents and other materials.” In re Search of Fair Fin., 692 F.3d at 429-30; see also United States v. DeJournett, 817 F.3d 479, 484 (6th Cir. 2016) (observing that the Sixth Circuit hás applied the experience and logic test to judicial records). Thus, we concluded, it was “appropriate to apply the test ... in considering whether there should be access to documents involved with the issuing and execution of a search warrant.” In re Search of Fair Fin., 692 F.3d at 430. In reaching this conclusion, we “reject[ed] the government’s suggestion that there is no First Amendment right of access to search warrant documents ... due to the fact that the search warrant application process is an investigative rather than a criminal proceeding.” Id.
If the experience and logic test applies to agriculture department voter lists, university student disciplinary proceedings, municipal planning meetings, and state agency records, see In re Search of Fair Fin., 692 F.3d at 430; Detroit Free Press, 303 F.3d at 695, then it applies to execution proceedings and documents. No circuit has concluded otherwise. The only circuit to consider whether the public has a right of access to view executions—the *426 Ninth Circuit—applied the experience and logic test and concluded that “the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those ‘initial procedures’ that are inextricably intertwined with the process of putting the condemned inmate to death.” Cal. First Amendment Coal. v. Woodford, 299 F.3d 868, 877 (9th Cir. 2002).
All three circuits to address the question in the present case, moreover, have applied the experience and logic test. See Zink v. Lombardi, 783 F.3d 1089, 1112-13 (8th Cir. 2015); Wood v. Ryan, 759 F.3d 1076, 1081-83 (9th Cir. 2014); Wellons v. Comm’r, Ga. Dep’t of Corr., 754 F.3d 1260, 1266 (11th Cir. 2014). The Ninth Circuit held that, under the experience and logic test, the plaintiff had “raised serious questions as' to whether a First Amendment right, in the context of a public executions, attaches to the specific information he requests.” Wood, 759 F.3d at 1086. It thus “grant[ed] a conditional preliminary injunction, staying [the plaintiffs] execution until the State of Arizona has provided him with (a) the name and provenance of the drugs to be used in the execution and (b) the qualifications of the medical personnel.” Id. at 1088.
The Eighth and. Eleventh Circuits applied this test and did not find a right of access. Those cases, however, are distinguishable and do not support the proposition that a right of access is barred as a matter of law. The decision in the Eighth Circuit, Zink, turned on pleading deficiencies. See 783 F.3d at 1112 (observing that the plaintiffs had “fail[ed] to allege a ‘tradition of accessibility’ to that information” and “ha[d] not alleged facts or cited authority establishing that the particulars of execution methods have ‘historically been open to the press and general public’ ”). It thus simply stands for the proposition that, when the experience and logic test applies, plaintiffs must set forth allegations that satisfy the test to survive a- motion to dismiss.
The decision in the Eleventh Circuit, Wellons, held that “the district court did not abuse its discretion in concluding that [the plaintiff] is not entitled to injunctive relief on [the right of access] claims.” 754 F.3d at 1267. Crucial to the district court’s decision, however, was the fact that the plaintiff had asserted á personal rather than public right of access: the district court acknowledged “First Amendment implications involved in the openness of government operations,” but concluded that “the cases [the plaintiff] relies upon turn on the public’s, rather than the individual’s, need to be informed so as to foster debate.” Id. at 1266. Here, by contrast, plaintiffs are raising both their right of access and that of the public.[3]
2. The majority’s reliance on Houchins is misplaced.
In Detroit Free Press, we provided three reasons why “Houchins [was] not the applicable standard to resolve the First Amendment claim of access” in that case; all apply equally here. See Detroit Free Press, 303 F.3d at 694. First, “[t]he issue before the Court in Houchins ... was ‘whether the news media have a constitutional right of access to a county jail, over and above that of other persons, to interview inmates and make sound recordings, films and photographs for publication and *427 broadcasting by newspapers, radio and television.’” Id. (quoting Houchins, 438 U.S. at 3, 98 S.Ct. 2588). In Detroit Free Press and the present case, by contrast, the plaintiffs “do not claim a ‘special privilege of access’ ” to information about the source of lethal-injunction drugs. Id. The plaintiffs here expressly seek access for themselves and the public.
Second, we observed that “Houchins rested, its holding on the Court’s interpretation of the press clause,” which is “distinct from the speech clause”—the clause at issue here. Id. Indeed, the Supreme Court’s “line of cases from Richmond Newspapers to Press-Enterprise II”— which were decided after Houchins and interpreted both the speech and press clauses—“recognize that there is in fact a limited constitutional right to some government information and also provide a test of general applicability for making that determination.” Id. at 700.
Third, we questioned whether Houchins even remained good law. We pointed to Justice Stevens’s concurrence in Richmond Newspapers, which emphasized that Houchins “represented a plurality opinion of the Court.” Id. at 694. As such, its conclusions were “neither accepted nor rejected by a majority of the Court.” Id. Indeed, “[i]n repeatedly applying Richmond Newspapers’s two-part ‘experience and logic’ test,” we reasoned, it would seem “clear that the [Supreme] Court has since moved away from its position in Houchins.” Id. at 695. As. for the “policy reasons underlying the Court’s plurality opinion in Houchins,” we added, the experience and logic test “sufficiently addresses all of the Houchins Court’s concerns for the implications of a constitutionally mandated general right of access to government information.” Id. at 694-95. For all of these reasons, we “question[ed] the vitality of the standard articulated in Houchins.” Id. at 694.
Houchins does not control the present case for one more reason: unlike the regulation in Houchins, HB 663 shrouds the sources of lethal-injection drugs in absolute secrecy. The Supreme Court has indicated that a regulation that completely bars access is materially distinct from a regulation that only partially restricts access. The Houchins Court, for example, took care to emphasize that the regulation did not “prevent [the newspapers] from learning about jail conditions in a variety of ways,- albeit not as conveniently as they might prefer.” 438 U.S. at 15, 98 S.Ct. 2588. It noted that the newspapers could “receive' letters from inmates criticizing jail officials and reporting on conditions,” could “interview those who render the legal assistance to which inmates are entitled,” as well as “seek out former inmates, visitors to the prison, public officials, and institutional' personnel. . ” Id. at 14, 98 S.Ct. 2588. In specifying these avenues— avenues unavailable here—the Court cited to an earlier decision in which it expressed skepticism of any “attempt by the State to conceal the conditions in its prisons or frustrate the press’ investigation and reporting of those conditions.” Pell v. Procurer, 417 U.S. 817, 830, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).
The Houchins Court’s analysis was fashioned to address a regulation that only partially restricted access. It effectively concluded that the access already available to the newspapers satisfied the First Amendment. HB 663 presents an entirely different—and more alarming—restriction because “there exist no alternative means ,. to learn about” the source of lethal-injection drugs. Detroit Free Press, 303 F.3d at 696 n.12. Our case law teaches that Houchins is the wrong framework for this case. Under our precedent, this panel *428 should apply the experience and logic test, the Supreme Court’s test for determining whether the public is entitled to access at all. That test is the proper determiner of whether HB 663 is unconstitutional.
3. Wood does not raise “grave doubts” about plaintiffs’ claim.
The lead opinion suggests that the Supreme Court’s summary disposition in Wood “raises grave doubts as to whether [a right-of-access] claim is legally cognizable in the first place.” (Maj. Op. at 419.) This reads too much into the Court’s three-sentence order. The plaintiff in Wood, a death row inmate scheduled for lethal injection, had requested information from the Arizona Department of Corrections on the source of the lethal-injection drugs that would be used in his execution, information about the qualifications of those persons who would administer the drugs, and information and documents related to how the Department developed its lethal-injection protocol. 759 F.3d at 1079. The Department denied this request and the plaintiff sued, arguing that “by deliberately concealing lethal injection information, the Department ha[d] violated [his] ... First Amendment ... right to be informed about the manner in which Arizona implements the death penalty....” Id. He requested a preliminary injunction “preventing the Department from carrying out his execution until it provide[d] him with the information he request[ed].” Id. The district court denied the preliminary injunction. Id.
As discussed above, the Ninth Circuit applied the experience and logic test on appeal and granted a preliminary injunction. Id. at 1086-88. Two days later, the full court denied rehearing en banc. Judge Kozinski dissented, concluding that if the plaintiff in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), “could not get a stay of execution under the Eighth Amendment,” then the plaintiff in Woods “certainly is not entitled to one under the First.” Id. at 1102 (Kozinski, J., dissenting from denial of rehearing en banc). Judge Kozinski did not address the underlying merits of the First Amendment right-of-access claim; he addressed only whether the plaintiff was entitled to a stay of execution.[4]
Judge Kozinski’s dissent tracked an argument made by Judge Bybee, who dissented from the majority opinion. Judge Bybee argued that even if the plaintiff’s First Amendment claim had merit, he was not entitled to a stay of execution:
No one doubts that [the plaintiff] “has a strong interest in being executed in a constitutional manner.” Beaty v. Brewer, 649 F.3d 1071, 1072 (9th Cir. 2011). But the right asserted by [the plaintiff] differs from the constitutional challenges often raised by inmates facing execution. The First Amendment right of public access inheres in all of the members of the public, and not just the inmate who has been sentenced to death.... It is not self-evident that the First Amendment right will be irreparably harmed if that information is not disclosed before [the plaintiffs] execution, but is instead disclosed only if the view espoused by [the plaintiff] ultimately prevails after the case is fully litigated. Whatever benefit society derives from being able to discuss who made the drug and who injected it would presumably still inure to the public if that conversation oc *429 curred after [the plaintiff] has been executed.
Id. at 1100-01 (Bybee, J., dissenting). Notably, the majority itself acknowledged that “[tjhere are special considerations in a capital case when a plaintiff requests a stay of execution,” that the government has a “strong interest in enforcing its criminal judgments,” and that “filing an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course.” Id. at 1080.
In a three-sentence order issued on July 22, 2014—one day before the plaintiffs scheduled execution—the Supreme Court vacated the Ninth Circuit’s judgment granting a conditional preliminary injunction. Ryan v. Wood, — U.S., --, 135 S.Ct. 21, 189 L.Ed.2d 873 (2014). The Court did not address the merits of the plaintiffs underlying. First Amendment claim. Rather, the Court appears to have concluded, as did Judge Kozinski, that even if an inmate has a viable First Amendment right-of-access claim, this claim is insufficient. to grant a stay of execution. The Court’s summary disposition in Wood does not raise “grave doubts” about whether plaintiffs’ First Amendment right-of-access claim is legally cognizable.
4. Plaintiffs’ allegations state a First Amendment right-of-access claim.
Plaintiffs satisfy both parts of the experience and logic test. First, their complaint sets forth a number of allegations that the proceeding or record has “historically been open to the press and the general public,” In re Search of Fair Fin., 692 F.3d at 429, including:
• The information necessary to refute the misconception that lethal injection provides an “enviable” “quiet death” has come from various traditionally open ■ sources and proceedings including litigation/evidentiary hearings, discovery, public records requests, media reports, and investigations, among other sources. (R. 1, PagelD 17, ¶ 55.)
• There is no history or tradition—let alone a long history or tradition—in Ohio of restricting speech against those persons and entities who have chosen, for their own personal, political, economic, or other reasons, and who are compensated for their participation, to supply drugs and other essential execution supplies or to otherwise perform professional services for purposes of lethal injection executions. To the contrary, in fact, there is a history of openness in Ohio’s execution process. (R. 1, Pa-gelD 52, ¶ 148.)
• Key participants have always been subject to public scrutiny and their identities never shielded, with the exception of some DRC employees actually on the execution team (for whom existing protections, even if proper, are already sufficient without HB 663). For example, the identities of the following direct and indirect participants in Ohio’s lethal injection executions have never been shielded but' would be now under the Challenged Provisions of HB 663: (i) medical and other experts and consultants retained by the State; (ii) drug suppliers and pharmacists used by the State for securing the execution drugs; (iii) doctors, nurses, and mental health professionals conducting 'the required checks and assessments on an inmate in the minutes, hours and days leading up to an execution; (iv) doctors and nurses directly participating in executions (including, for ex *430 ample, the doctor who participated in [the] attempted execution [of death row inmate Romell Broom]); (v) doctors assessing the inmate’s status during an execution and pronouncing death; (vi) pharmacists, lawyers, and other professionals involved in providing the required periodic trainings and rehearsals for the execution team members; and (vii) many other direct participants in executions including DRC upper management personnel at levels below the director, DRC lawyers (e.g., during Broom’s attempted execution), DRC’s spokespersons and press officers, and the DRC employees who create the contemporaneous execution timeline for an execution or otherwise generate documents related to administration of the execution protocol. (R. 1, PagelD 52-53, ¶ 149.)
• This public right of access has constitutional protection because ,.. executions and associated documents and information have historically been open to the press and general public, in Ohio and in other states_(R. 1, PagelD 64, ¶ 204.)
Plaintiffs’ complaint also sets forth a number of allegations that “public access plays a significant positive role in the functioning of the particular process in question,” In re Search of Fair Fin., 692 F.3d at 429, including:
• This public right of access has constitutional protection because ... the public access plays a significant positive role in the functioning of the execution process. (R. 1, PagelD 64-65, ¶ 204.)
• An informed public debate is critical in determining whether a specific execution method comports with this country’s evolving standards of decency, and even more so at this time in history where, for reasons addressed throughout this Complaint, there is intense public interest in whether lethal injection is capable of being administered in a humane manner. (R. 1, PagelD 65, ¶ 205.)
• Given the factual backdrop of the many recent botched executions and the unavailability of execution drugs manufactured by the companies of big-Pharma, more information about the drugs used in lethal injections can help an alert public make more informed decisions about the evolving standards of decency in this country surrounding lethal injection. Knowing the source of the drugs, ■ and the qualifications, credentials, competence, protocols, and reputation of the drug makers and other professionals involved in the execution process, among other information, allows the public to discern whether Defendants are using safe and reliable drug manufacturers, and would give the public the basic confidence, beyond the State’s generic as- ■ surances, that executions will be administered safely and pursuant to certain qualifications and standards. (R. 1, PagelD 65, ¶ 206.)
Finally, plaintiffs allege that the Ohio secrecy law is not justified by a compelling interest, and that the law is not narrowly tailored. Because these allegations are sufficient to state a First Amendment right-of-access claim, I would reverse the district court’s order dismissing this claim.
C. Procedural Due Process
The lead opinion disposes of plaintiffs’ due process claim in a single paragraph, citing to cases in which inmates have raised a constitutional right of access to the courts. Specifically, the majority points to Lewis v. Casey, 518 U.S. 343, 116 S.Ct. *431 2174, 135 L.Ed.2d 606 (1996), where the Supreme Court held that an inmate’s right of access to courts does not include conferral of “sophisticated legal capabilities,” Id. at 354, 116 S.Ct. 2174. Inmates have a right to the resources “need[ed] .in order to attack their sentences ... and ... challenge the conditions of their confinement,” the Court explained, but the Constitution “does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip- and-fall claims.” Id. at 355, 116 S.Ct. 2174.
This is not a case about extraneous litigation: it is a case about death-sentenced inmates seeking information required “in order to attack their [death] sentences.” Id. The appropriate analysis of plaintiffs’ due process claim employs the procedural due process framework set forth in the line of cases beginning with Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This framework is outlined in detail in Jones v. Commissioner, 812 F.3d 923 (11th Cir. 2016), where a bare majority of judges—six of the Eleventh Circuit’s eleven judges—voted to deny rehearing en banc of a decision upholding Georgia’s Lethal Injection Secrecy Act. Four dissenting judges joined Judge Wilson’s excellent dissent, which concludes that the Eleventh Circuit’s rejection of “due process challenges to the Secrecy Act without applying [the Goldberg and Mathews procedural due process] framework” is “legal error” that “is fatal to [its] jurisprudence.” Id. at 935 (Wilson, J., dissenting). The majority here makes the same error.
Procedural due process analysis proceeds in two steps. First, the court must determine “[wjhether any procedural protections are due,” which “depends on the extent to which an individual will be ‘condemned to suffer grievous loss.’ ” Morris-sey v. Brewer, 408 U.S. 471, 481, 483-90, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (specifying minimum due process requirements for parole revocation). “The Fourteenth Amendment’s Due Process Clause protects persons against deprivations of life, liberty, or propérty; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.” Wilkinson v. Austin, 545 U.S. 209, 221, 224, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (finding a protected liberty interest in avoiding state assignment to a super-max prison). Thus, the Due Process. Clause requires procedural protections when the loss is both weighty and “within the contemplation of the ‘liberty or property’ language. of the Fourteenth Amendment.” Morrissey, 408 U.S. at 481, 92 S.Ct. 2593.
Once the court determines that an interest is entitled to procedural protections, “the - question remains what process is due.” Id. To answer this question, the court “evaluate[s] the sufficiency of particular procedures” using the framework set forth in Mathews, which entails weighing the following factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Wilkinson, 545 U.S. at 224-25, 125 S.Ct. 2384.
' In the present ease, the interest at stake is the right to be executed in a manner that comports with the Eighth Amendment’s prohibition on “cruel and unusual punishments.” Glossip v. Gross, — U.S. —, 135 S.Ct. 2726, 2737, 192 L.Ed.2d 761 (2015). As Judge Wilson observes in his *432 dissent in Jones, the Supreme Court has recognized far less weighty interests as “grievous losses” entitled to procedural protections, such as property interests in continuing civil servant employment and receiving public utilities. See Jones, 812 F.3d at 937-38 (Wilson, J., dissenting). A prisoner’s “right to be free from an unconstitutional invasion of his body is a liberty interest under the Fourteenth Amendment.” Jones, 812 F.3d at 938 (citing Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct 1000, 35 L.Ed. 734 (1891); Washington v. Harper, 494 U.S. 210, 229, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding that “[t]he forcible injection of medication into a nonconsenting [prisoner’s] body represents a substantial interference with that person’s liberty” under the Fourteenth Amendment)). To vindicate this interest, an inmate must have a fair opportunity to challenge unconstitutional methods of execution. See Hall v. Florida, — U.S. -, 134 S.Ct 1986, 2001, 188 L.Ed.2d 1007 (2014) (“The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution.”) American jurisprudence has long recognized the “heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life.... ” Ford v. Wainwright, 477 U.S. 399, 410, 414, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (holding that the Eighth Amendment prohibits inflicting the death penalty on a prisoner who is insane). The plaintiffs are thus entitled to procedural protections that guarantee “the basic ingredient of due process, namely, an opportunity to be allowed to substantiate a claim before it is rejected.” Id.
The next question, then, is whether HB 663 deprives plaintiffs of procedural protections to which they are entitled. To make this determination, the court must weigh the Mathews factors. Plaintiffs have alleged that “[b]y concealing critical information about the specific drugs the State intends- to use to execute [them],” HB 663 “frustrates [their] ability to fairly and effectively litigate their claims relating to the constitutionality of their executions by lethal injection,” and thus “denies Plaintiffs their rights not to be deprived of their lives without due process of law.” (R. 1, PagelD 62-63, ¶¶ 196, 198.)[5] Indeed, the district court itself acknowledged that HB 663 would “unquestionably handicap! ] Plaintiffs’ pursuit of their protocol challenge in related litigation.” Phillips v. DeWine, 92 F.Supp.3d 702, 716 (S.D. Ohio 2015). Noting that the harsh result from its decision “is a matter of some unease,” the court explained,
In execution protocol challenges, the law tells death-sentenced inmates to bring evidence into the courtroom while concurrently upholding a scheme that places the bulk of select evidence outside the reach of the inmates. The neces-saiy is also the withheld: you must give us that which you cannot have to give. In order to challenge the use of a drug that -yrill be used to execute them, inmates must explain why use of that drug presents a risk of substantial harm. But the inmates are not allowed to know from where the drug came, how specifically it was manufactured, or who was involved in the creation of the drug.
Id. at 716-17. Plaintiffs have thus properly alleged a life or liberty interest in a constitutional execution, protected by due process requirements, and that their interest *433 is placed at risk of erroneous deprivation by HB 663.
I agree with Judge Wilson and the four judges who joined him that “[i]t is simply not difficult to conceive of a cost-effective procedure through which [Ohio] may account for death row prisoners’ due process rights while protecting its stated interests” in “continuing to administer capital punishment in a fiscally and administratively viable manner.” Jones, 812 F.3d at 940. For example, Ohio could ban public release of the information, but provide prisoners limited access under protective order. Id. Based on the allegations in* the complaint, then, I think that the Mathews factors weigh heavily for the plaintiffs and they have stated a due process claim.
D. CONCLUSION
The decision today undermines constitutional protections in several particulars. It denies standing to bring a First Amendment claim based on the right to receive information, barring the plaintiffs from obtaining information essential to pursuit of their claims and denying the public information necessary to, and historically used for, developing the evolving standards of decency that govern our society and should inform our law. Second, it denies the plaintiffs’ First Amendment claim to right of access to execution proceedings and documents, a claim fairly stated under the applicable experience and logic test. Finally, it fails our due process test: it rejects a claim without providing (actually while prohibiting) an opportunity to prove it.
The complaint properly alleges speech that speakers desire to utter and both the plaintiffs and the public desire to hear. It alleges that HB 663 is a direct reaction to anti-death-penalty speech that historically has been available to- the public—speech that had proven successful in the court of public opinion. And it alleges the inherent wrong of imposing evidentiary standards an inmate must meet to protect his right to be executed in compliance with the Eighth Amendment, then denying him the opportunity to challenge secrecy laws that prohibit him, or anyone on his behalf, from obtaining that information. It is simply not enough to acknowledge “unease” with or the “absurdity” of that constitutional catch 22. And there is no need here to engage in such conscience-soothing rhetoric because plaintiffs’ allegations state a claim.
Death penalty cases are not just about punishing a convicted person. These cases are also about protecting the functioning of our justice system, which for the reasons stated above envisions a forum for addressing the claims made in this litigation, and perhaps other litigation over state lethal injection secrecy laws. It is my belief that our criminal justice system does—and should—provide death-sentenced inmátes a fair opportunity “to show that the Constitution prohibits their execution” before we reject their claims. See Hall, 134 S.Ct. at 2001.
Accordingly, I respectfully dissent.

. The district court avoided this question by reading § 2949.221(F) to authorize suit against state actors alone. This is a strained and, in my view, erroneous interpretation of § 2949.221(F). Because the majority concludes that plaintiffs do not have standing under either interpretation, that reading does not resolve this issue.

. The procedural posture also makes this case different from Wellons. 754 F.3d at 1263. In Wellons, the plaintiff needed to show a likelihood of success on the merits; in the present case, plaintiffs need only show that they have pled sufficient allegations to state a claim. See id.

. The other dissenters questioned the majority’s application of the experience and logic test (as well as the standard for granting a preliminary injunction), but did not argue that the experience and logic test did not apply. Id. at 1103-05 (Callahan, J., dissenting).

. In their parallel suit against Ohio’s execution protocol, In re Ohio Execution Protocol (16-3149), plaintiffs' explain at length how this secrecy undermines their constitutional claims.